The **CHARIOT GROUP, INC.**, Plaintiff,

v.

**AMERICAN ACQUISITION PARTNERS, L.P., American Acquisition Partners, Ltd., B.A. Partners L.P., B.A. International, Inc., Colin J. Draper, Inc., Colin J. Draper, and Ted Bustany,** Defendants.

**No. 89 Civ. 2868 (LLS).**

United States District Court,
S.D. New York.

Dec. 4, 1990.

Latham & Watkins, New York City (Selvyn Seidel, Louis Zeitzew, of counsel), for plaintiff.

Davis, Markel & Edwards, New York City (Jay E. Gerber, George F. Hritz, Michele M. Newman, of counsel), for defendants.

## OPINION AND ORDER

STANTON, District Judge.

Each side moves for summary judgment in its favor on the issue of whether a contract had been made when negotiations regarding the sale of a corporation fell apart.

## ·BACKGROUND

In mid-1988 plaintiff, The Chariot Group, Inc. ("Chariot"), decided to sell one of its wholly owned subsidiaries, Energy Saving Products, Inc. ("ESP"), by an auction. Chariot retained as its agent Citicorp Mergers and Acquisitions ("Citicorp"), who sent defendant American Acquisition Partners ("AAP") a confidential offering memorandum and a letter dated July 25, 1988, prescribing bidding procedures as follows:

(1) Bidders would submit "preliminary indications of interest";

(2) Proposals would be evaluated by Chariot;

(3) A limited number of bidders would be invited to make their "due diligence" inquiry; and

(4) "Upon the completion of due diligence, potential acquirors will be requested to submit a binding offer to the Chariot Group for its consideration."

Pl. Exh. 1–a. After further communication between Citicorp and AAP, on August 26, 1988 Citicorp sent defendant Colin Draper, a principal and part owner of AAP, an invitation "to submit a formal proposal to purchase ESP," and enclosed "a draft stock purchase agreement ... containing the basic terms upon which the Chariot Group [the seller] is contemplating a transaction."

Pl. Exh. 1–b. Citicorp's guidelines required written answers to seven specific questions, Pl. Exh. 1–b ¶ (2), of which item 2(d) required "clearly marked proposed changes or additions to the attached Purchase Agreement."

Paragraph (3) of the August 26, 1988 letter stated:

> Each prospective purchaser should indicate in its Offer that it is prepared to execute promptly the Purchase Agreement in the form submitted by such party. The extent and nature of any changes proposed by a prospective purchaser to the form of the Purchase Agreement will be taken into consideration by The Chariot Group in evaluating Offers.... Any changes which could delay consummation or increase the risk of nonconsummation of the purchase will be viewed negatively.

Pl. Exh. 1–b ¶ (3) (emphasis in original). Chariot reserved the right to reject any offer. Pl. Exh. 1–b ¶ (6).

Paragraph 6.1(c)(iii) of the Draft Purchase Agreement ("Agreement") imposed, as a condition to closing, that Buyer received an opinion of Seller's counsel that the Agreement "has been duly executed and delivered by, and constitutes a valid and binding agreement of" the Seller. Paragraph 6.2(c)(iii) likewise imposed as a condition to closing, that Seller received an opinion of Buyer's counsel that the Agreement "has been duly executed by, and constitutes a valid and binding agreement of Buyer...." Pl. Exh. 9–b ¶¶ 6.1(c)(iii), 6.2(c)(iii). The Agreement had an integration clause. Id. at ¶ 9.7. Paragraph 9.8 stated: "This Agreement may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original, and all of which together shall constitute one and the same instrument." Id. at ¶ 9.8.

On September 6, 1988 AAP sent a letter to Citicorp, signed by Mr. Draper, which constituted "the expression of our intention to acquire by purchase ... the entire share capital of ESP." Pl. Exh. 9–a. In answer to Citicorp's question 2(d), AAP stated that "the Purchase Agreement would be subject to the addition of warranties ..., and to minor, negotiable changes in the original draft." Id. at ¶ (d). AAP said that it could close the transaction by October 31, 1988. Id. at ¶ (h).

On September 15, 1988, Citicorp acknowledged "receipt of your letter ... expressing your desire to purchase all of the stock of ESP ..." and stated that "we have received and expect to continue to receive further inquiries concerning the sale of ESP's stock. However, until September 27, 1988, provided our negotiations do not break down before then, we will not encourage future inquiries or engage in any negotiations for the sale of ESP's stock." Def. Exh. E. ESP was then taken off the market. At defendants' request, Chariot extended the September 27 deadline, see, e.g., Pl. Exh. 11–a, and ESP thereafter remained off the market until the situation disintegrated on November 7, 1988.

On October 28, 1988 Chariot broke off the negotiations. Pl. Exh. 14. Nevertheless, they resumed after October 31, 1988 when defendant Draper, of AAP, wrote a letter to Mr. Richard E. Gray, the chairman of Chariot's board and its chief executive officer, stating among other things that "We remain anxious to move ahead to a signing this week [i.e. by Friday, November 4, 1988].... The responses received from banks and lending institutions have provided comfort about a closing date of 31st January 1989.... The only open point of significance which I see relates to the earnout payments." The letter closed:

> Finally, I sincerely hope you will allow us to bring this transaction to signature and completion without the payment of some form of deposit to ensure our good faith. We have already invested sufficient time and money into the deal to provide a forceful incentive for us to continue to a successful conclusion and I hope you will accept my expression of firm intention.

Pl. Exh. 15.

November 4, 1988 was the target date for execution of the contract. On that day, Mr. Richard Gray and Mr. James T. Kelly (of Chariot) met with Mr. Colin Draper and Mr. Ted Bustany (of AAP) at Chariot's

offices to resolve outstanding issues and sign the Agreement. Draper Aff. ¶ 5; Gray Aff. ¶ 36. Neither party's attorney was present. At the close of discussions, Mr. Gray left the meeting. Mr. Kelly then called Chariot's attorney, Patrick Morris, Esq., in the AAP's principals' presence and with their participation, and gave Mr. Morris revisions to the contract. Kelly Aff. ¶ 7. Then Mr. Kelly left, and Messrs. Draper and Bustany remained to await re-typing of the contract. Draper Aff. ¶ 5. Because of "logistical" and other delays caused in part by the need to identify the AAP entities who were to sign the contract, the body of the revised draft did not arrive at Chariot's offices on November 4. Kelly Aff. ¶ 13. Late that day, defendants Draper and Bustany signed several copies of the execution page of the contract with no draft of the contract attached. Draper Aff. ¶ 5. They gave all the signed copies to Ms. Ellen Carlson, the assistant to the Chairman of Chariot's board, who sent all those pages to defendant AAP's attorney. Carlson Aff. ¶¶ 5, 9; cf. Draper Reply Aff. ¶ 5. Apparently, she did not retain a copy of the execution pages signed by Draper and Bustany. See Carlson Aff. ¶¶ 6–9.

Defendants insist that the pages were executed on November 4 for convenience only, and that they were to be held in escrow by AAP's attorney until all the parties were satisfied that the contract document accurately reflected the parties' agreement and the November 4 discussions. Alter Aff. ¶ 19; Draper Aff. ¶ 5. They claim that they gave the execution pages to Ms. Carlson only to have her arrange their overnight delivery in escrow to their own (AAP's) attorney. Alter Aff. ¶ 19; Draper Reply Aff. ¶ 5.

Plaintiff, on the other hand, maintains that the defendants' execution of the signature pages manifested their intention to be bound. It claims that Ms. Carlson was free to keep a copy of the signed pages before sending them to defendants' attorney, but did not because the copying machines at Chariot were not working, see Carlson Aff. ¶¶ 6–7, and that the defendants never mentioned that the executed signature pages were to be held in escrow. Carlson Aff.

¶ 7; Morris Aff. ¶ 3, fn. 1. See also Draper Reply Aff. ¶ 5.

On Sunday November 6, Mr. Morris (Chariot's attorney) telecopied a copy of the Agreement to Mr. Alter (AAP's attorney). Alter Aff. ¶ 21; Morris Aff. ¶ 9.

On Monday, November 7, Mr. Alter called Mr. Morris with further comments. The parties arranged a conference call with Mr. Gray (plaintiff's principal), Mr. Morris, Mr. Draper (defendant's principal) and Mr. Alter to discuss these comments. Alter Aff. ¶ 22; Morris Aff. ¶ 11. Defendant Bustany was not involved in this conversation. Plaintiff claims that the issues discussed were essentially minor and that all of them were resolved in that conference call. Gray Aff. ¶¶ 44–46. Defendants claim that major substantive issues, including the level of subordination of the promissory notes that Chariot was to hold, the grounds for terminating the contract, and the non-competition clause, were discussed. Alter Aff. ¶¶ 21–22. After these discussions, Mr. Gray claims, and Mr. Morris corroborates, that he stated that he was going to issue a press release "about the agreement with AAP." Gray Aff. ¶ 47; Morris Aff. ¶ 12. Mr. Alter recalls no such statement, Alter Aff. ¶ 22, and Mr. Draper maintains that they were not asked to, nor did they, approve or authorize such a release. Draper Aff. ¶ 5. Mr. Gray then signed a copy of the execution page and sent it to Mr. Morris. Gray Aff. ¶ 49; Pl. Exh. 21. The execution page Mr. Gray signed was not attached to a draft of the Agreement. It was not one of the execution pages that the principals of AAP had signed, since all of those copies were still in the possession of Mr. Alter. Subsequently Mr. Gray authorized a press release announcing the sale, Gray Aff. ¶ 50; Pl. Exh. 22. After further conversations between the principals, on the afternoon of November 7, 1990, AAP informed Chariot that it would not agree to the contract in its existing form. Draper Aff. ¶ 8.

Earlier that day, AAP's attorney, Mr. Alter, anticipating the transaction would close, had drafted a letter to Chariot's attorney in which he stated:

This will confirm that the documents which you facsimilied to us today showing the changes made by you following our telephone conversation this morning with our respective clients are acceptable as agreed and as modified by us this afternoon.

Accordingly, to evidence the agreement of our respective clients, we are transmitting herewith the signature page to the Stock Purchase Agreement signed by the Buyer, as such term is defined in the Agreement.

We are transmitting this to you in escrow with the understanding that the Buyer shall not be bound by the Agreement until we have received the signature pages of the Agreement signed by the Seller, as such term is defined in the Agreement, and Chariot Plastics, Inc.

If we do not receive from you the foregoing signature pages signed by your clients by the close of business on November 8, 1988, you will return the unsigned [sic] signature pages of the Buyer to us under cover of a letter from you acknowledging that the Buyer is not bound by the terms of the Agreement.

Pl. Exh. 20. This letter and its planned enclosures were never sent, and plaintiff first learned of its existence during discovery. The deal collapsed completely on November 29, 1988. See Pl. Exhs. 26–29. This lawsuit followed.

In a seven count complaint, Chariot alleges breach of contract (count one); fraud in connection with the purchase or sale of a security in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) (1988), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1990), promulgated pursuant to Section 10(b) (count two); common law fraud (count three); breach of a contract formed through promissory estoppel (count four); failure to negotiate in good faith (count five); unjust enrichment (count six); and tortious and malicious interference with Chariot's contractual rights (count seven). Subject matter jurisdiction is predicated on the alleged violations of 15 U.S.C. § 78j(b) and Rule 10b–5. All other counts rest on pendent jurisdiction.

AAP moves for summary judgment dismissing counts one and two on the grounds that no contract was formed, and for discretionary dismissal of the other counts for lack of an independent basis of jurisdiction. *See Mayer v. Oil Field Sys. Corp.,* 803 F.2d 749, 756–57 (2d Cir.1986) (trial court did not abuse its discretion when it declined pendent jurisdiction where federal securities claims were dismissed on summary judgment); *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 945 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). Chariot cross-moves for summary judgment in its favor on the breach of contract claim, the 10b–5 claim and the common law fraud claim.

AAP's motion is granted as to count two because "there is no genuine issue as to any material fact and [AAP] is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The rest of plaintiff's claims are dismissed without prejudice, for lack of an independent basis of jurisdiction.

## DISCUSSION

### Summary Judgment

Summary judgment shall be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Summary judgment is appropriate when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the nonmoving party." *Lund's, Inc. v. Chemical Bank,* 870 F.2d 840, 844 (2d Cir.1989). If a motion for summary judgment is properly supported, "the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting Fed.R. Civ.P. 56(e)).

*10b–5 Jurisdiction—The Governing Legal Standard*

The subject matter jurisdiction of this court rests on the alleged violation of Rule 10b–5.

■ Only purchasers and sellers of securities have claims under Rule 10b–5. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 1934–35, 44 L.Ed.2d 539 (1975). Since a contract to purchase or sell securities is itself a security, *see id.* 95 S.Ct. at 1932 (citing 15 U.S.C. § 78c(a)), a contract to purchase or sell securities can be the basis for a claim under Rule 10b–5 even if the contract is breached and no securities are actually bought or sold. *See id.* at 1932–33; *Commerce Reporting Co. v. Puretec, Inc.*, 290 F.Supp. 715, 718–19 (S.D.N.Y.1968). Even an oral contract which reflects a meeting of the minds, although it is unenforceable under the statute of frauds, is sufficient to confer 10b–5 jurisdiction. *Desser v. Ashton*, 408 F.Supp. 1174, 1176–77 (S.D.N.Y.1975), *aff'd*, 573 F.2d 1289 (2d Cir.1977) (table).

■ On the other hand, if the parties never entered into a binding agreement to purchase or sell securities, plaintiff has no 10b–5 claim regardless of any alleged fraud in the negotiation of such an agreement. *Reprosystem B.V. v. SCM Corp.*, 727 F.2d 257, 265 (2d Cir.) ("[B]ecause we have concluded that [defendant] did not enter into a contract, the plaintiffs fall outside even that enlarged class of persons who are protected by Rule 10b–5."), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984); *Northland Capital Corp. v. Silver*, 735 F.2d 1421, 1431 (D.C. Cir.1984) ("[F]ederal securities laws do not confer upon the federal courts a roving commission to address every injury that a sophisticated, albeit small, investment concern ... may suffer in the course of *attempting* to negotiate and close a deal [involving securities].") (emphasis in original).

*Was There a Contract to Purchase or Sell Securities?*

■ To recover under section 10b–5, plaintiff must establish a contract to buy or sell securities. It is not enough to prove breach of a commitment to negotiate in good faith until a contract to purchase securities was finally executed, because such a commitment could not by itself be deemed either a security or a contract to buy or sell a security.

In determining whether a contract has been formed under circumstances similar to those here, one considers that:

> first, if the parties intend not to be bound until they have executed a formal document embodying their agreement, they will not be bound until then; and second, the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event.

*V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.1968) (citations omitted), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969). The language the parties use in their draft agreements and in their contemporaneous communications is the most important indication of whether a signed writing is required before the parties are bound. See *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir.1984).

Here the parties' contemporaneous communications demonstrate that they contemplated that the final agreement would be in the form of, and evidenced by, a formal written document duly executed by both parties, and that until such a document was executed and delivered, regardless of the state of negotiations, drafts of the agreement were nothing more than drafts. In its October 31, 1988 letter requesting that negotiations be reopened, AAP three times explicitly denominated the signing as the completion of a contract. *See* Pl. Exh. 15 ("We remain anxious to move ahead to a signing...."; "[A]chieving a signing this week will be our priority task."; "I sincerely hope you will allow us to bring this transaction to signature and completion...."). Other contemporaneous communications confirm this intention. *See e.g.*, Pl. Exh. 1–b ¶ 3 ("*Each prospective purchaser should indicate in its Offer that it is prepared to execute promptly*

*the Purchase Agreement in the form submitted by such party."*) (emphasis in original); Pl. Exh. 11–a ("Arriving at a definitive purchase agreement always takes time."). The draft Agreement itself conditioned the closing on due execution and delivery. *See* Pl. Exh. 9–b ¶¶ 6.1(c)(iii), 6.2(c)(iii).

The Second Circuit has expressly held that such language, in the context of negotiations over drafts of written agreements, indicates that the parties are working towards the goal of a written, signed contract and protects them from being bound until due execution. *See Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 81 (2d Cir.1985); *R.G. Group,* 751 F.2d at 71, 75–76; *Reprosystem,* 727 F.2d at 260–262. *See also PDL Vitari Corp. v. Olympus Indus., Inc.,* 718 F.Supp. 197, 207 (S.D.N.Y.1989) ("[T]he mere fact that the parties negotiated their agreement with an eye to reducing it to a formal writing, as evidenced by the sending back and forth of draft agreements, suggests strongly, if not conclusively, that the parties intended to be bound only once they had executed the licensing agreement."); *Shearson Lehman CMO, Inc. v. TCF Banking and Sav. F.A.,* 710 F.Supp. 67, 70–71 (S.D.N.Y.1989); *Precision Testing Laboratories, Ltd. v. Kenyon Corp. of America,* 644 F.Supp. 1327, 1342–44 (S.D.N.Y.1986); *United Acquisition Corp. v. Banque Paribas,* 631 F.Supp. 797, 806–07 (S.D.N.Y.1985) ("There is no language in the draft agreement ... to indicate that it was drafted pursuant to an oral agreement or that there was any intent other than that the writing be the definitive agreement"); *Songbird Jet Ltd. v. Amax Inc.,* 605 F.Supp. 1097, 1102 (S.D. N.Y.), (even assuming an oral agreement on all terms was reached, the parties should have been aware that it was not binding until reduced to writing and executed), *aff'd,* 779 F.2d 39 (2d Cir.1985) (table).

Three other factors, used to determine whether the parties are bound before a written contract is executed, are whether there was partial performance, whether there was anything left to negotiate, and whether the agreement is a type of contract generally committed to writing. See *Winston,* 777 F.2d at 80.

In this case, there was no partial performance.

Concerning whether anything was left to negotiate, plaintiff argues that all major issues were settled by November 4, 1988, and that the new issues defendants raised on November 7 were settled that day. Defendants assert that many substantive issues were left to be negotiated on November 7, Alter Aff. ¶¶ 21–22, and that the November 7, 1988 revisions were unsatisfactory because:

> (a) Chariot refused to retain full responsibility for potential federal tax deficiency for ESP's previous years;
>
> (b) Chariot continued to insist that AAP reimburse Chariot for payments to be made in 1988 to the officers of ESP; and
>
> (c) the amount of taxes which AAP was to reimburse the Chariot [sic] at the time of closing was still unresolved.

Draper Aff. ¶ 7. "It is not for the court to determine retrospectively that at some point in the evolution of a formal document that the changes being discussed became so 'minor' or 'technical' that the contract was binding despite the parties' unwillingness to have it executed and delivered." *Winston,* 777 F.2d at 83.

Finally, the sale and transfer of control of a business through the sale of all the stock is the type of agreement that is generally put in writing. *United Acquisition Corp.,* 631 F.Supp. at 808.

Refusing to bind parties prior to signature under these circumstances is sound policy. As Judge Friendly stated in *Int'l. Telemeter Corp. v. Teleprompter Corp.,* 592 F.2d 49, 58 (2d Cir.1979) (Friendly, J., concurring):

> [W]hen the parties have manifested an intention that their relations should be embodied in an elaborate signed contract, clear and convincing proof is required to show that they meant to be bound before the contract is signed and delivered. Such a principle would accord with ... the intention of most such potential contractors; they view the signed written

instrument ... as "the contract", not as a memorialization of an oral agreement previously reached.

In this case, the parties do not dispute that on November 4, 1988, Mr. Colin Draper and Mr. Ted Bustany handed executed signature pages to Ms. Ellen Carlson and instructed her to send those pages to their own attorney. *See* Kelly Aff. ¶¶ 9, 12; Carlson Aff. ¶¶ 4–9, Plaintiff's Statement Pursuant to Local Rule 3(g) ¶ 8; Defendant's Statement Pursuant to Local Rule 3(g) ¶ 12. The outcome of the disputes over whether "escrow" was mentioned on November 4, 1988, and the other events of that or later days, are immaterial, since there was no execution and delivery as required by the draft Agreement as a condition to the parties being bound to the contract. *See* Pl. Exh. 9–b ¶¶ 6.1(c)(iii), 6.2(c)(iii).

It is undisputed that the signature pages signed by AAP's principals were not attached to any agreement at the time defendants executed them. It is undisputed that further negotiations and revisions occurred after November 4, 1988. It is undisputed that all the execution pages were sent to defendants' attorney with the understanding that he would attach those pages to the contract when and if he found that the draft of the contract conformed with the oral instructions. It is undisputed that defendants cancelled the contract before their attorney delivered the executed signature pages to the plaintiff; in fact, those signature pages were never attached to any draft agreement and were never delivered to the plaintiff. These undisputed facts compel the conclusion that the defendants signed the signature pages for their convenience only and not as an objective manifestation of their intent to be bound. On the contrary, because defendants took

care to ensure that the executed signature pages remained in the custody of their attorney until such time as he and they approved the written contract, they manifested an intent not to be bound until that time.[1]

Significantly, defendants did not send the executed signature page to plaintiff's attorney, Mr. Morris, although it was he who had the draft contract in his possession. Thus their objective manifestation was that they did not consider the attachment of the signature pages to the balance of the contract to be purely ministerial. All the parties involved understood, or should have understood, that delivery of the signature pages to the plaintiff was contingent on defendants' attorney's satisfaction with the draft of the Agreement, and that until the signature pages were given to the plaintiff, the defendants were not bound.

Plaintiff focuses on the initial communications between the parties in the attempt to prove that even without AAP's putative execution of the contract, a binding commitment on AAP's part existed.[2] While plaintiff's argument may be relevant to its common law contract and fraud claims, it does not establish a federal claim under Rule 10b–5.

■ There are two types of preliminary binding contracts. In the first type the parties reach a complete agreement, perceive themselves to be bound, but desire a more elaborate formalization. In the second type the parties "bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement." *Teachers Ins. and Annuity Ass'n. v. Tribune Co.*, 670

---

1. Plaintiff contends that the defendants gave the signature pages to Ms. Carlson and that she could have retained a copy of those pages but did not because the copying machines were not working. Nevertheless, there is no assertion that she was given permission to make and retain such a copy.

2. Plaintiff's July 25, 1988 letter to AAP contemplated an auction sale in which bidders even-

tually would be required to submit "binding offers" to Chariot, leaving Chariot free to pick and choose the offer it would accept. Pl. Exh. 1–a. The August 26, 1988 letter from Chariot to AAP invited AAP to submit a "formal offer." Pl. Exh. 1–b. Plaintiff argues that when AAP responded, on September 6, 1988, with an "expression of [ ] intention to purchase," a binding commitment was created. Pl. Exh. 9–a.

F.Supp. 491, 498 (S.D.N.Y.1987). If AAP was bound before November 4, 1988, it was bound only to the second type of agreement. Absent due execution of the Agreement, even if defendants were bound to a preliminary agreement to negotiate in good faith, there was no agreement to sell securities, and hence nothing on which to predicate jurisdiction under 15 U.S.C. § 78j(b) (1988), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1990). *Reprosystem B.V. v. SCM Corp.*, 727 F.2d 257, 265 (2d Cir.), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).

## CONCLUSION

Defendants' motion for summary judgment dismissing count two of the complaint is granted on the grounds that no contract to purchase or sell securities was ever formed. The remainder of the counts are dismissed without prejudice, for lack of an independent basis of jurisdiction, *see Mayer v. Oil Field Sys. Corp.*, 803 F.2d 749, 756–57 (2d Cir.1986); *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 945 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). Plaintiff's cross motion for summary judgment is denied.

So ordered.