Ostler v. Codman Research          CV-98-356-JD     8/12/99

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


David B. Ostler

    v.                                Civil No. 98-356-JD

The Codman Research Group, Inc.
and S. Philip Caper


AMENDED ORDER[1]


Plaintiff, David B. Ostler, brings an action against his former employer, The Codman Research Group, Inc. ("CRG"), and CRG's chief executive officer, S. Philip Caper, arising from events that lead to Ostler's decision not to exercise his CRG stock option.  Ostler's second amended complaint alleges claims of withholding information and imposition of an unlawful condition, breach of contract, federal and state securities fraud, and common law fraud.  CRG moves for summary judgment on all claims.[2]


Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file,

_____

[1]The amended order corrects typographical errors and an omitted citation found in the original order.

[2]Ostler's motion for partial summary judgment (document no. 68) will be addressed separately.

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The record evidence is taken in the light most favorable to the nonmoving party. Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 748 (1st Cir. 1996). "An issue is only 'genuine' if there is sufficient evidence to permit a reasonable jury to resolve the point in the nonmoving party's favor, while a fact is only 'material' if it has the potential to affect the outcome of the suit under the applicable law." Bourque v. F.D.I.C., 42 F.3d 704, 707-08 (1st Cir. 1994) (quotations omitted). Summary judgment will not be granted as long as a reasonable jury could return a verdict in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Background[3]

CRG, which was founded in 1984 by Philip Caper and Dr. John Wennberg, makes software for the health care industry. Ostler was hired as chief financial officer in 1985, and then served as chief operating officer beginning in 1986. Caper served as president and chief executive officer from 1984 through 1998,

_____

[3]The facts are taken from the parties' fact summaries and are provided for background information only.

2

except for the period between 1989 and 1993 when Ostler was president and CEO.

Because CRG was not able to keep current with the salaries owed to Ostler and Caper, they agreed that CRG would issue stock options to Ostler and Caper in exchange for a deferral of portions of their compensation. As part of the plan, CRG, Caper, and Ostler agreed that an option to purchase stock would be issued to Ostler in the same amount and on identical terms as an option issued to Caper. On July 28, 1988, CRG issued to Ostler an option to purchase "an aggregate of 3,000 shares of non-voting Common Stock" at twenty cents per share pursuant to a "1988 Non-Qualified Stock Option Plan" ("Plan") and subject to the terms of the document granting the option ("Option Document").[4] An option was issued to Caper under the same terms while other employees received options for different amounts of stock.

Under the terms of the Plan and the Document, the options were to expire ten years later. To exercise their options, Ostler and Caper were obligated to pay the amount of income tax due on the difference between the stated price of the stock and the fair market value on the day the option was exercised. If CRG went public before the option's expiration date, a market

---

[4]Because of a subsequent stock split, the recipients held options on 60,000 shares and the assigned price was reduced.

3

would exist for the stock that would allow the option holders to sell stock to pay the substantial tax liability.

CRG did not fare well, however, suffering financial losses and the loss of its senior management. Ostler left CRG in 1994. CRG remained a private company so that CRG stock could not be sold to fund the tax liability that would be incurred by exercising the stock options. In 1997, as the option expiration date of July 27, 1998, approached, CRG began to consider ways to allow their current employees, including Caper, to afford the tax liability on the exercise of their options. CRG first passed a resolution to arrange loans for option holders who were employees at the exercise deadline to pay the tax liability. No loans were ever arranged or made under the resolution.

A year later, in January of 1998, the CRG board amended the Plan to offer an opportunity for the deferred delivery of option stock in order to defer federal income tax liability until the stock was delivered. The deferred delivery opportunity was offered to highly compensated employees. Caper and another employee who was deemed qualified for the deferral made the deferred delivery election. Another CRG employee who was not deemed qualified for the deferred delivery opportunity borrowed money from the company to pay the tax liability on the exercise of her option. Ostler was not offered the deferred delivery

4

opportunity or a company loan to pay the tax liability on his option.

In February of 1998, Ostler wrote to Caper requesting information about the company. Caper referred the letter to CRG's chief financial officer, Merrill Keefer, who communicated with Ostler thereafter. In the course of their communications, Keefer told Ostler that if he exercised his option, CRG would most likely report the transaction at a valuation of $26.50 per share. Ostler was dissatisfied with CRG's responses to his requests for information and filed his complaint in this court on June 15, 1998, with a motion to expedite discovery. Ostler also filed a motion for a preliminary injunction to enjoin CRG from enforcing the terms of the Plan. Ostler's discovery motion was granted in part, and CRG provided more information.

CRG hired PriceWaterhouseCoopers ("PWC") to do a valuation of CRG's stock shares for tax reporting purposes. Ostler's motion for a preliminary injunction was denied on July 15. On the same day, Ostler informed CRG, in a letter to Keefer, that he wished to exercise his option to purchase and asked about the tax liabilities. Five days later, Keefer sent Ostler a letter informing him of the valuation work being done by PWC. On July 21, 1998, CRG's counsel sent Ostler's counsel a letter about the valuation and enclosing the investment letter to be signed as a

5

condition of exercising the option.  On July 22, Ostler's counsel was informed that PWC's preliminary indication of value for the stock was between seventeen and nineteen dollars per share.  The valuation report was delivered to Ostler on July 24 and valued the shares at $16.94 each.  On July 27, however, the deadline for Ostler to exercise his option, counsel for CRG notified Ostler's counsel by voicemail that the PWC valuation was going to be reduced by one or two dollars per share.  CRG's counsel represented that the deadline would be extended for forty-eight hours.  The final PWC report was faxed to Ostler on July 28, and on July 29 Keefer told Ostler that the deadline would be extended until July 31.

For the first time, on July 29, Keefer told Ostler that CRG was engaged in preliminary merger discussions with HealthTech Services Corporation and provided information pertinent to the merger plans.[5]  Ostler did not exercise his option either before the July 27 deadline or within the extensions suggested by CRG counsel and Keefer.[6]  Ostler says that when he asked, through

_____

[5]Ostler argues, supported by his expert witness's report, that CRG withheld the most important information:  a valuation matrix, the fact that the board had approved the merger proposal, and a combined business plan summary.

[6]Ostler contends that neither extension was valid since neither was passed by the CRG board, whose approval was required and who later refused to approve the extensions.

6

counsel, for a seven-day extension after receiving the merger information, the defendants did not respond to his request. CRG's merger negotiations with HealthTech moved in a positive direction, and the merger occurred on January 27, 1999.

## Discussion

The defendants move for summary judgment on all of Ostler's claims. They argue that the agreement does not entitle Ostler to the deferred delivery opportunity offered to Caper. The defendants assert that Ostler lacks standing to bring federal and state securities claims, and that his fraud claims fail because no material misrepresentations or omissions were made and because Ostler did not rely on any misstatements or omissions by CRG. The defendants also contend, alternatively, that Ostler should be judicially estopped from claiming damages as a result of an alleged breach of the agreement or due to fraud.

### A. Breach of Contract

Under New Hampshire law, the court interprets the meaning of a contract as a matter of law, including the determination of whether the contract is ambiguous. Hopkins v. Fleet Bank-NH, 724 A.2d 1287, 1289 (N.H. 1999). The intent of the parties is interpreted from the context of the whole agreement, construing

7

its terms according to their common and reasonable meaning. <u>See</u> <u>BankEast v. Michalenoick</u>, 138 N.H. 367, 369 (1994). An agreement is ambiguous only if the parties offer differing reasonable interpretations of the agreement. <u>See</u> <u>Merrimack School District v. National School Bus Serv., Inc.</u>, 140 N.H. 9, 11 (1995). Extrinsic evidence may be considered to find the meaning of an ambiguous agreement but not to contradict the plain and unambiguous meaning of an agreement. <u>See</u> <u>Galloway v. Chicago-Soft, Ltd.</u>, 713 A.2d 982, 984 (N.H. 1998); <u>Holden Engineering and Surveying, Inc. v. Pembroke Road Realty Trust</u>, 137 N.H. 393, 396 (1993).

The parties do not dispute that they orally agreed in 1988 that Ostler and Caper would be issued options on identical terms. Based on the parties' negotiations and agreements, the Plan was drafted and approved, and, pursuant to the Plan and the Option Document, CRG issued Ostler and Caper options on 3,000 shares on identical terms. Ostler argues that the "identical terms" requirement continued through the implementation of the Plan and award of the option and required CRG to offer him the same deferred delivery opportunity that was later offered to Caper under the the 1998 amendment. The defendants contend that the "identical terms" requirement was fully performed when the stock options were awarded in 1988.

Ostler's interpretation of the agreement to include a continuing "identical terms" requirement is unreasonable in the context of the agreement as a whole.[7] Neither the Plan nor the award document includes any requirement that Ostler and Caper be treated on identical terms. Instead, the Plan has an eligibility requirement and provides for amendment of the Plan. Under the terms of the Plan, after Ostler left CRG in 1994, he was no longer eligible to participate in the Plan so that the deferral opportunity, added by amendment in 1998, did not apply to him.[8]

If the "identical terms" requirement, which was an oral agreement, were interpreted, as Ostler urges, to be a continuing part of the parties' agreement, it would contradict the expressed terms of the Plan in the circumstances of this case. In the context of the agreement taken as a whole, therefore, Ostler's interpretation is unreasonable. See Chadwick v. CSI, Ltd., 137 N.H. 515, 525 (1993). Since the oral and written parts of the agreement can be construed to work together, if the "identical terms" requirement is understood to have been fully performed

---

[7]Since the parties do not address the operation of the statute of frauds, N.H. Rev. Stat. Ann. § 506:2, or the merger doctrine, the court does not analyze either theory in deciding the motion for summary judgment.

[8]Although the parties do not explain the operation of the agreement package as a whole, it appears that Ostler retained his option after he left CRG based on the terms of the Option Document.

9

when the stock options were awarded in 1988, that is the only reasonable interpretation of the parties' intent.

Ostler argues that an implied covenant of good faith and fair dealing in the "identical terms" part of the agreement prevents an interpretation that would permit changes in the Plan to confer benefits to Caper and not to Ostler because that would unilaterally deprive him of the benefit of the "identical terms" agreement. The good faith and fair dealing argument fails for the same reasons that Ostler's interpretation of the agreement is unreasonable. The agreement, taken as a whole, does not confer discretion in performance that would permit CRG to deprive Ostler of the value of the agreement, but instead the Plan expressly provides eligibility requirements for future benefits and a process for amendment. The Plan was amended in 1998 to offer the opportunity of deferred delivery of stock, and Ostler, under the terms of the Plan, was not eligible for benefits conferred after he left CRG. Since the "identical terms" agreement was fully performed long before the 1998 amendment to the Plan, no discretionary change in the agreement occurred in breach of the good faith covenant.

Accordingly, the parties' agreement is construed, as a matter of law, to require that the 1988 stock option award to Ostler and Caper be made on identical terms, which occurred when

the stock options were awarded in 1988.  The parties did not agree that any other benefits accorded under the Plan would be awarded to Ostler and Caper on identical terms.  The benefits offered by the 1998 amendments to the Plan were additional benefits for those who were then eligible under the Plan.  Since Ostler was not eligible, based on the Plan provisions, for the benefits added by the 1998 amendment, the defendants are entitled to summary judgment as to Ostler's breach of contract claim.

B.   Standing to Bring Federal and State Securities Claims

Ostler asserts federal securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b).[9]  Persons who are either purchasers or sellers of

---

[9]Section 78j(b) makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security, . . . any manipulative device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  The Securities and Exchange Commission has promulgated Rule 10b-5 that makes it

   unlawful for any person, directly or indirectly, . . .

   (a) To employ any device, scheme, or artifice to defraud,
   (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
   (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

11

securities have standing to bring private actions for damages under the federal securities laws. See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 731, 749 (1975). Persons who refrain from buying or selling, although their forbearance is due to material misrepresentations or omissions, lack standing. Id. at 737. The term security is defined to include an option, 15 U.S.C.A. § 78c(10); and buy, purchase, sell, and sale are all defined to include a contract to acquire or dispose of a security, § 78c(13) and (14). Accordingly, a purchaser of options who is injured by deception or fraud "in connection with" the purchase or sale or a contract to acquire or dispose of options has standing to bring claims under Rule 10b-5.

Ostler was a purchaser of securities within the meaning of the 1934 Act when CRG issued the option to him in 1988. See, e.g., Yoder v. Orthomolecular Nutrition Inst., 751 F.2d 555, 559 (2d Cir. 1985). If Ostler were alleging fraud in connection with his decision to accept, as employment compensation, the award of stock option in 1988, he would have standing to raise that claim. The more difficult question is whether he has standing, as a holder of an option to purchase CRG stock, to bring a claim that

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (1998).

he was injured by the defendants' alleged deception or fraud in connection with his decision <u>not</u> to exercise his option.

In <u>Blue Chip Stamps</u>, the Supreme Court adopted the "<u>Birnbaum</u> rule" to limit private securities actions "to actual purchasers and sellers of securities." <u>Id.</u> at 730 (discussing <u>Birnbaum v. Newport Steel Co.</u>, 193 F.2d 461 (2d Cir. 1952)). The Court examined the language and purpose of pertinent provisions of the Securities and Exchange Act of 1934 and found the policy of the Act supported limiting the implied private cause of action to those who actually participated in securities transactions because

> a putative plaintiff who neither purchases nor sells securities but sues instead for intangible economic injury such as loss of a noncontractual opportunity to buy or sell, is more likely to be seeking a largely conjectural and speculative recovery in which the number of shares involved will depend on the plaintiff's subjective hypothesis.

<u>Id.</u> at 734-45. The right of action, the Court reasoned, should not be available to mere offerees and bystanders who could construct retrospective fraud claims. <u>See</u> <u>id.</u> at 746-47. In contrast to offerees and bystanders, however,

> the holders of puts, calls, options, and other contractual rights or duties to purchase or sell securities have been recognized as "purchasers" or "sellers" of securities for purposes of Rule 10b-5, not because of a judicial conclusion that they were similarly situated to "purchasers" or "sellers," but because the definitional provisions of the 1934 Act themselves grant them such a status.

13

<u>Id.</u> at 751. Therefore, while a disappointed offeree lacks standing to maintain a securities fraud claim, a plaintiff who holds a contractual right, such as an option, to purchase securities stands on different ground. <u>See</u> <u>Blue Chip Stamps</u>, 421 U.S. 751-52. There appear to be few if any cases, however, that address the question of standing to assert a securities claim alleging fraud that induced the holder of an option not to exercise the option at the end of the option period, and analogous cases come to different conclusions due in part to different factual circumstances.

Two cases cited by the defendants address the standing of stockholders who were disappointed because they did not sell their shares, as invited, during corporate mergers and acquisitions, and in both cases the court held that the plaintiffs lacked standing since they did not purchase or sell securities. <u>See</u> <u>Marsh v. Armada Corp.</u>, 533 F.2d 978 (6th Cir. 1976); <u>Gaudin v. K.D.I. Corp.</u>, 417 F. Supp. 620 (S.D. Ohio 1976). In <u>Jackovny v. RIHT Financial Corp.</u>, a shareholder alleged fraud in the course of a corporate acquisition that lead him to turn in shares of one company, which, due to subsequent undisclosed acquisition, greatly appreciated, for shares of another. 873 F.2d 411, 412-13 (1st Cir. 1989). The court considered the standing issue, commenting, "we are aware of no authority holding

14

that an option holder's _failure_ to exercise an option to buy falls within the critical language: 'purchase,' or 'contract to buy, purchase, or otherwise acquire.'" Id. at 414. The case was decided on the lack of materiality of the alleged fraud, however, not on standing, making the court's remarks _dicta_.

In two cases cited by Ostler, the courts determined that holders of convertible securities who decided not to convert to stock, based on the defendants' alleged fraud, had standing to bring securities actions. See Green v. Hamilton, 437 F. Supp. 723 (S.D.N.Y. 1977); Camp v. Genesco, Inc., No. 75 Civ. 3571, 1976 WL 771, Fed. Sec. L. Rep. ¶ 95,473 (S.D.N.Y. Mar. 17, 1976) (aff'd following reargument, No. 75 Civ. 3471, 1976 WL 818, Fed. Sec. L. Rep. ¶ 95,679 (S.D.N.Y. Aug. 6, 1976)). While the reasoning in those cases is both helpful and persuasive, as the court recognized in Camp v. Genesco, the best authority in support of standing for a holder of a contractual right to buy or sell securities, who alleges that he did not exercise his right due to fraud, is Blue Chip Stamps.

In Blue Chip Stamps, a stock offering was made pursuant to a consent decree in a civil antitrust action that provided for merger of the old Blue Chip company into a newly formed corporation, Blue Chip Stamps. See 421 U.S. at 725-26. The plaintiffs were offerees of stock under the terms of the consent

15

decree and reorganization plan who alleged that they did not buy the offered shares due to the allegedly overly pessimistic prospectus issued with the offering. Id. at 726-27. The issue in the case was whether the plaintiffs had standing to bring securities fraud claims under Rule 10b-5. As noted above, the Court adopted the Birnbaum rule that limits plaintiffs to purchasers and sellers of securities, but then recognized an exception to the rule, based on the applicable statutory definitions, for those who hold contractual rights to buy or sell securities. Id. at 750-51. The Court found that the plaintiffs did not have standing because the consent decree did not confer enforceable contractual rights to purchase stock in the newly formed company. Id. In contrast, plaintiffs who hold contractual rights to purchase stock, such as holders of options, are recognized as purchasers and have standing to bring securities fraud actions. Id. at 751.

A contractual right to purchase stock can be understood to satisfy the standing requirement in actions alleging fraud in connection with a decision not to exercise the right based on either the status conferred by the applicable statutory definitions or by operation of the contractual right itself. The analysis in Blue Chip Stamps suggests that one who holds a contractual right to purchase securities has standing based on

the status conferred by the definition of purchaser.  See, e.g., Pelletier v. Stuart-James Co., 863 F.2d 1550, 1555 (11th Cir. 1989) ("Accordingly, a person who alleges a violation of Rule 10b-5 must demonstrate that he is an actual purchaser or seller, or that he was party to a legally enforceable contract to purchase or sell securities."); Fry v. UAL Corp., 895 F. Supp. 1018, 1031 (N.D. Ill. 1995) (protection of securities laws limited to actual participants in securities markets including options); Chariot Group v. American Acquisition Partners, 751 F. Supp. 1144, 1149-52 (S.D.N.Y. 1990).

From another viewpoint, however, a right to purchase stock conferred by a contract that has not yet expired might be construed as a continuing transaction, in that the purchase began when the option was awarded and is not complete until the term of the option has expired.  Therefore, fraud that occurs during the course of the transaction, that deprives the option holder of the benefit of the contractual right, is fraud in connection with the purchase of securities.  See, e.g., Pelletier, 863 F.2d at 1559; Ohashi v. Verit Indus., 536 F.2d 849, 853 (9th Cir. 1976).

In this case, Ostler held a contractual right to purchase CRG stock at the time he alleges the defendants' fraud occurred. He alleges that the defendants fraudulently induced him not to exercise his contractual right, causing him to lose the value of

17

the option.  Therefore, under either theory Ostler would have standing to bring federal securities claims as a holder of a contractual right to purchase securities.  Accordingly, based on the record presented, the defendants have not demonstrated that they are entitled to summary judgment as a matter of law on the ground that Ostler lacks standing to bring a Rule 10b-5 claim.

The defendants also move for summary judgment arguing that Ostler lacks standing to maintain his state securities law claim based on the limitations imposed by the <u>Birnbaum</u> rule.  New Hampshire's securities laws apply to fraud "in connection with the <u>offer</u>, sale, or purchase of any security," and "offer" includes "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value."  RSA § 421-B:3, § 421-B:2, XIX.  In the context of Ostler's claims, therefore, the New Hampshire laws arguably provide more protection than the federal securities laws. Further, since the defendants have not demonstrated that Ostler is not entitled to protection under the federal securities laws, their arguments in favor of summary judgment as to the state law claims must also fail.

C.  Materiality of the Defendants' Alleged Misstatements

    and Omissions

The defendants contend that they did not make any material misstatements or omissions in their communications with Ostler.[10] "A misrepresented or omitted fact will be considered material only if a reasonable investor would have viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available.'" Gross v. Summa Four, Inc., 93 F.3d 987, 992 (1st Cir. 1996) (quoting Basic, Inc. v. Levinson, 485 U.S. 224, 232 (1988)).  The omitted or misrepresented information must also be substantially likely to be considered important to the investment decision by a reasonable investor.  See Milton v. Van Dorn Co., 961 F.2d 965, 969 (1st Cir. 1992) (quoting Basic, Inc., 485 U.S. at 231-32).  Summary judgment is warranted only if reasonable minds "could not differ as to the materiality of the undisclosed information." Id. at 970.

---

[10]The defendants also argue briefly, in the context of materiality, that they did not intend to commit fraud.  The scienter requirement has not been raised in sufficient detail, however, to permit analysis for purposes of summary judgment. Cf. Press v. Chemical Investment Servs. Corp., 166 F.3d 529, 537 (2d Cir. 1999) (discussing scienter requirement for Rule 10b-5 claim).

19

1.  <u>CRG's valuations of shares for tax purposes.</u>

Each option holder was obligated, by the terms of the Option Document, to pay CRG "at the time of exercise an amount equal to the amount of any [federal, state, or local] taxes or charges," and CRG's valuation of the shares for purposes of assessing taxes determined the amount to be paid.  According to the Option Document, the deadline for Ostler to exercise his option was July 27, 1998.

In response to Ostler's request for information, Merrill Keefer, CRG's chief financial officer, sent Ostler a letter on April 29, 1998, that said that CRG "would most likely report the transaction to the IRS at a valuation of $26.50 per share . . . unless some event establishing a different valuation occurred prior to the time you exercise."  Defendants' memorandum at 24. On June 17, Keefer sent another letter reporting a value of $17.68 per share based on a "preliminary term sheet."  On July 25, CRG sent Ostler a draft accounting report prepared by PWC valuing the shares at $16.94 each, and two days later notified him that the value would likely be one or two dollars less.  CRG contends that none of the valuation information was untrue.

Ostler argues that the defendants' failure to notify him in May that PWC was doing a valuation was a misrepresentation because the defendants knew they would not use the $26.50

valuation.[11]  In light of all of the information that was finally available and significant to Ostler's decision, the out-of-date valuation seems insignificant.  At least by mid-June Ostler knew that the valuation was likely to be $10 a share less.  Ostler admits that the more significant issue is the lack of information about the pending merger.

   2. Omission of information about the pending merger
      With HealthTech.

Although CRG provided other information about the company's finances and prospects including information about other merger opportunities, it appears to be undisputed that CRG did not disclose the merger opportunity with HealthTech until July 29. CRG also, apparently, did not inform PWC of the merger possibility so the impact of the merger was not considered in PWC's valuation reports.[12]  Before the disclosure, Ostler contends, the defendants presented an overly pessimistic view of CRG's prospects coupled with a significant tax liability for exercising the option.  When the defendants finally disclosed the

---

[11]Although CRG says they did not hire PWC to do the valuation until June, Keefer in his deposition said that he began talking with PWC in April or May about doing a valuation.

[12]Presumably PWC would have valued the shares at a higher amount if the defendants had disclosed the merger information for purposes of the valuation.

pending merger with HealthTech, they still did not include information that Ostler contends was most significant to his decision whether or not to exercise the option.

In essence, the defendants argue the record shows that they did not omit or misrepresent material information because they disclosed the PWC valuations and the pending merger to Ostler before he made his decision not to exercise. The timeliness and completeness of their disclosures remain at issue, however.[13] Therefore, the defendants have not shown that they are entitled to summary judgment as a matter of law on the issue of materiality.

D. Reliance

"To establish a claim under section 10(b) of the Securities Exchange Act, a plaintiff must prove, in connection with the purchase of a security, that the defendant, with scienter, falsely represented or omitted to disclose a material fact upon which the plaintiff justifiably relied." Kennedy v. Josephthal & Co., Inc., 814 F.2d 798, 804 (1st Cir. 1987). Justifiable reliance links the defendants' fraud to the plaintiff's injury.

---

[13]Although Ostler now argues that the deadline was never extended so the information disclosed on July 29 was too late, at the time, he apparently thought the deadline had been extended and acted accordingly.

See Basic, Inc., 485 U.S. at 243. When a plaintiff claims fraud by affirmative misrepresentation, the plaintiff bears the burden of proving reasonable reliance. See Simon DeBartolo Group, L.P. v. The Richard E. Jacobs Group, Inc., No. 97-9613, 1999 WL 547893 (2d Cir. July 28, 1999). Positive proof of reliance is not required, however, "where a duty to disclose material information [has] been breached." Basic, Inc., 485 at 243 (citing Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-53 (1972)).

The defendants argue that Ostler did not rely on any of their alleged omissions or misrepresentations in making his decision not to exercise the option. The defendants first note that he filed the present securities fraud suit before the exercise deadline. Therefore, they contend, Ostler cannot claim to have relied on information he had already alleged was false. The defendants do not include a list of the statements they assert were previously alleged to be false. The first complaint, at pages 12 and 13, lists four misrepresentations as to the tax value of the stock. Otherwise, the complaint appears to primarily allege a lack of information rather than affirmative fraud. To the extent the defendants seek summary judgment as to any particular statements, their motion and memorandum are not sufficiently specific to permit judgment in their favor.

The defendants also argue that Ostler did not rely on any of

their statements or omissions because his decision was the result of his wife's vacation and his "discomfort with the new developments at CRG." Defendants' memorandum at 29-30. Ostler explained in his deposition that he let the option expire because he was not able to consult with his wife, who was away on vacation, about the new developments at CRG before making the decision.[14] In response, Ostler contends that the defendants withheld the information most important to his decision, that Ostler's expert says would have shown that even under the least desirable possibility, he would gain by exercising the option. Ostler argues that without the most significant information, he relied on the less rosy, but incomplete, picture the defendants presented, causing him to let the option expire. Therefore, Ostler asserts, the defendants defrauded him by omitting significant material information about the company and he need not show his reliance.

The defendants have not shown that Ostler will not be able to prove that the omitted information was material. Nor is it clear from the record that Ostler's "discomfort with the new developments at CRG" was not the result of the defendants' delay in providing material information and continued nondisclosure of

_____

[14]Ostler says that he requested a further extension of the deadline which the defendants did not allow.

material information.  The question of Ostler's justifiable reliance on the information the defendants' provided raises too many factual issues to be resolved on the present record for summary judgment.

Because the defendants' seek summary judgment with respect to Ostler's state securities law claims and common law fraud claims on the arguments raised in favor of summary judgment on the federal claims, they are not entitled to summary judgement on the state claims for the same reasons.

E. <u>CRG's Obligations Under the Plan and Option Document</u>

In Count I, Ostler alleges that CRG withheld information and imposed "an unlawful condition" on the exercise of his option. The legal theory behind Count I is unclear.  For purposes of summary judgment, CRG interprets Ostler's allegations as a breach of contract claim.  In so doing, CRG notes that the Option Document required Ostler, as a condition precedent to exercising the option, to provide an investment letter that would include, among other things, a statement that Ostler or his representatives had fully investigated the company and its finances and "have knowledge of the Company's then current corporate activities and financial condition."  Defendants' memorandum at 31.  CRG acknowledges that the investment letter

requirement "contained an implied promise by CRG to make such information available as reasonably required to conduct the investigation contemplated." Id. at 31-32. CRG then surmises that Count I pertains to its implied promise.

CRG contends it did not breach its promise because it sent 3,700 pages of information to Ostler by the July 3 deadline imposed by his counsel. As to the PWC valuation and HealthTech merger information, CRG says it complied with its promise by providing information about both before Ostler's option expired. Ostler correctly points out that it is not the amount of paper sent, but whether CRG failed to disclose material information necessary for Ostler to evaluate CRG's activities and financial condition. As discussed above, whether the defendants provided all material information in a timely manner is disputed.

Ostler also argues that the investment letter sent by the defendants' counsel for him to sign was different than the letter specified in the Option Document and included statements about CRG's compliance that were untrue. Ostler contends that the defendants' version of the letter would have required him to waive his fraud claims in order to exercise his options. The defendants assert that it was their right under the terms of the Option Document to require an investment letter in the form they wanted, and they were entitled to propose terms that would

26

require waiver of Ostler's suit.

The parties' disagreement about the meaning and intent of the investment letter requirement raises issues that neither have briefed, including the application of the doctrine of good faith and fair dealing to the Option Document. Based on the record presented, summary judgment is not appropriate on the claims raised in Count I.

F.  Judicial Estoppel

The defendants argue that Ostler should be judicially estopped from claiming damages because of representations he made in support of his motion for a preliminary injunction in this case. In support of his motion, Ostler stated in his affidavit that at the reported valuation of his shares, his tax liability would be in excess of $500,000, and "[w]ith no public market for the shares, I am unable to pay the associated taxes, and thus unable as a practical matter to exercise my valuable option rights." Affidavit of June 17, 1998 at ¶ 15. More recently, to meet the requirements of showing damages due to the defendants' alleged fraud, Ostler has represented that his father agreed to loan him money to pay the tax liability on the stock option. Ostler's father's affidavits confirm that he had discussed the stock option and his willingness to loan money to his son to

27

cover the tax liability.  Father and son agreed in late July to a loan to cover the tax liability.  The defendants argue that Ostler should be estopped from showing, through the agreement with his father, that he was able to pay the tax liability because he represented previously that he was not able to pay.

The doctrine of judicial estoppel prevents a party who succeeds with one position from later asserting a directly contrary position.  See Lydon v. Boston Sand & Gravel Co., 175 F.3d 6, 13 (1st Cir. 1999).  Ordinarily, judicial estoppel is used to bar a litigant from asserting inconsistent positions in proceedings before different tribunals to protect the integrity of the courts and to prevent a litigant from obtaining unfair advantage.  See id. at 12.  In an appropriate case, however, the doctrine may be considered, for example, as a sanction for inconsistent positions taken in bad faith during the same proceeding.  See Klein v. Stahl GMBH & Co., 1999 WL 498053 at *11 (3d Cir. July 15, 1999).

First, it is not entirely clear that Ostler's affidavit, saying that he was unable to pay a tax liability in excess of $500,000, is directly contrary or inconsistent with his later representations about his discussions and agreement with his father for a loan.  The defendants have not shown that Ostler denied all means of obtaining the money necessary to pay the

28

taxes in his first affidavit.

Second, it does not appear that Ostler's affidavit as to his inability to pay the taxes was successful. His motion for a preliminary injunction was denied on grounds that he had not demonstrated a likelihood of success on the merits of either his breach of contract or breach of fiduciary duty claims. His ability to pay the taxes was not discussed in the magistrate's analysis of irreparable harm. The defendants have not shown that Ostler's statement about his ability to pay had any effect on the imposition of expedited discovery in the case.

Even if the defendants were able to make the necessary showing on the two required elements for judicial estoppel, the remedy they urge, barring evidence of the loan agreement, would be an unnecessarily harsh sanction in this case. The defendants have not shown any bad faith, dishonesty, or an intent to "play fast and loose" with the court that would justify the imposition of judicial estoppel. See Klein, 1999 WL 498053 at *11-12; see also Casas Office Machines v. Mita Copystar, 42 F.3d 668, 676 (1st Cir. 1994). To the extent Ostler's first affidavit is inconsistent with his present claims that he would have paid the tax liability with a loan from his father, that issue may be explored through cross-examination.

29

<u>Conclusion</u>

For the foregoing reasons, the defendants' motion for summary judgment (document no. 65) is granted as to the plaintiff's breach of contract claim, Count II of the (second) Amended Complaint (document no. 61), and denied as to all other claims.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

August 12, 1999

cc:  William Edward Whittington IV, Esquire
     Bruce E. Falby, Esquire
     H. Jonathan Meyer, Esquire