Bennett v. Bennett, 2022 NCBC 15.

STATE OF NORTH CAROLINA

FORSYTH COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 48

BERT L. BENNETT III, individually
and on behalf of BENNETT LINVILLE
FARM LLC,

        Plaintiff,

    v.

GRAHAM F. BENNETT; ANN
BENNETT-PHILLIPS; JAMES H.
BENNETT; LOUISE BENNETT; and
BENNETT LINVILLE FARM, LLC,

        Defendants,

    and

JOHN J. BENNETT and JEANNE R.
BENNETT,

        Nominal Defendants.

**FINDINGS OF FACT, CONCLUSIONS
OF LAW, AND PARTIAL JUDGMENT
(STAGE 1 ISSUES)**

1. THIS MATTER came on for trial without a jury before the undersigned commencing on 28 March 2022. With the parties' consent, the trial was bifurcated so that determinations with respect to Bennett Linville Farm, LLC's controlling operating agreement and the number and identity of its managers could be decided first. Having concluded the evidence with respect to these "Stage 1" issues, the Court issues its Findings of Fact, Conclusions of Law, and Partial Judgment before proceeding with the balance of the case.

*Fitzgerald Litigation, by Andrew L. Fitzgerald and D. Stuart Punger,
and Brooks, Pierce, McLendon, Humphrey & Leonard L.L.P., by Jeffrey
Oleynik, for Plaintiff Bert L. Bennett III.*

*Bell, Davis & Pitt, P.A., by Kevin G. Williams and Allison B. Parker, for Defendants Graham F. Bennett, Ann Bennett-Phillips, James H. Bennett, and Bennett Linville Farm, LLC.*

Earp, Judge.

## I.     INTRODUCTION

2.     This is a case about a bedrock principle of contract formation: whether there was a meeting of the minds when the parties signed a document purporting to amend an operating agreement governing a limited liability company.  Plaintiff Bert L. Bennett III ("Bert" or "Plaintiff") contends that there was no such meeting of the minds and, therefore, the purported amendment does not control the affairs of the LLC holding the family property, Bennett Linville Farm, LLC ("BLF" or the "LLC").  Bert's siblings, Defendants Graham F. Bennett ("Graham"), Ann Bennett-Phillips ("Ann"), and James H. Bennett ("Jim"), contend that the signed amendment does control BLF's operations.

3.     The facts of this case present a unique situation.  The LLC involved was organized primarily as an estate planning device for the patriarch of a family whose children, each of whom were members of the LLC, deferred to their father's decisions regarding the property without question.

4.     The Bennett parents have since passed away, and the Bennett children are now divided over various actions taken on behalf of BLF.  At the center of their disagreement is whether the LLC's Operating Agreement was amended in 2010 (the "2010 Amendment").  Bert contends that the 2010 Amendment is invalid, and that certain decisions made pursuant to the 2010 Amendment, including the instatement

of his brother Jim as manager, are likewise invalid. Bert's brothers, Graham and Jim, along with his sister, Ann, contend (a) that the 2010 Amendment is valid; (b) that, as a result, Jim joins them as a manager of BLF; and (c) that, as the managers of BLF, their decisions have been in accordance with the 2010 Amendment.

5. Based on the following Findings of Fact and Conclusions of Law, the Court issues its Partial Judgment declaring that: (1) the 2010 amendment, (Jt. Ex. 107[1]), is valid and has been in effect since 1 October 2010; and (2) pursuant to the 2010 Amendment, BLF's managers are Graham, Ann, and Jim Bennett.

## II. PROCEDURAL HISTORY

6. Plaintiff initiated this action on 3 January 2018 by filing his Complaint. (ECF No. 4.) Plaintiff has since amended his Complaint three times.[2] (ECF Nos. 5, 25, 77.) On 13 September 2019, Defendants filed an Answer and asserted counterclaims. (ECF No. 95.)

7. Defendants filed their Notice of Designation as a Mandatory Complex Business Case on 12 April 2018 under N.C.G.S. § 7A-45.4. (ECF No. 6.) On 13 April 2018, this case was designated as a mandatory complex business case by the Chief Justice. (ECF No. 3.) The case was assigned to the Honorable Adam M. Conrad on

---

[1] Joint Exhibit 107 was referenced throughout the trial and is an authentic photocopy of the original 2010 Amendment, Joint Exhibit 107A.

[2] Prior to the third amendment, the Court dismissed with prejudice: (i) Plaintiff's second cause of action for breach of fiduciary duty against Graham, Ann, and Jim; (ii) Plaintiff's seventh cause of action for constructive fraud against Graham, Ann, and Jim; and (iii) Plaintiff's sixth cause of action for civil conspiracy to the extent it was based on the breach of fiduciary duty claim. *See Bennett v. Bennett*, 2019 NCBC LEXIS 19, at *35–36 (N.C. Super. Ct. Mar. 15, 2019).

18 April 2018, (ECF No. 2), and reassigned to the undersigned on 6 May 2021, (ECF No. 122).

8. Defendants filed their Motion for Summary Judgment on 2 December 2019, seeking entry of summary judgment on both Bert's claims and BLF's counterclaims. (ECF No. 101.) The Court heard the motion on 10 June 2020, (ECF No. 117), and issued its Order and Opinion on 16 December 2020, (ECF No. 120.)[3]

9. As a result of the Court's prior rulings and dismissals taken by the parties, the case proceeds to trial with Bert suing Defendants Graham, Jim, and Ann directly and derivatively on behalf of BLF.[4] Bert asserts a claim for declaratory judgment with respect to the validity of the 2010 Amendment, the capital calls made pursuant to it, and the decision to bar Bert and his family from accessing the property as a result of his refusal to pay capital. He requests that the Court declare the parties' ownership interests as of 13 April 2018. Bert also asserts claims for breach of contract resulting from Defendants' purchase of Louise's interest in BLF, claims for breach of the covenant of good faith and fair dealing and civil conspiracy also stemming from

---

[3] Defendants' Motion for Summary Judgment was granted in part and denied in part. The Court dismissed the following claims: (a) Plaintiff's claim for declaratory judgment to the extent that it is based on the declarations requested in subparagraphs 82(b), 82(c), 82(e), 82(f), and (b) Plaintiff's derivative claim for breach of fiduciary duty. Given the Court's ruling, the parties stipulated that nominal defendants John J. and Jeanne R. Bennett are not necessary or proper parties. (ECF No. 139.)

[4] Louise Bennett ("Louise"), another Bennett sibling and originally a defendant in this case, filed her Answer to Plaintiff's Third Amended Complaint on 13 September 2019, (ECF No. 94), and her Motion for Summary Judgment on 1 December 2019, (ECF No. 98). Plaintiff has since voluntarily dismissed his action as to Louise on 7 February 2022. (ECF No. 134.)

Louise's transfer, a claim for dissolution, and a derivative claim against his siblings for treating their capital obligations as loans to the LLC.

10. For their part, Defendants counterclaim for a declaratory judgment with respect to their right to redeem Bert's interest pursuant to the 2010 Amendment and, alternatively, assert a counterclaim for breach of contract resulting from Bert's failure to pay capital calls.

11. The parties waived their right to a jury trial and consented to a bench trial before the undersigned. The trial commenced on 28 March 2022 at the North Carolina Business Court, 1834 Wake Forest Road, Worrell Professional Center, Room 3205, Winston-Salem, North Carolina 27109. (ECF No. 128.) Given the pivotal role that a determination of the validity of the 2010 Amendment plays with respect to other issues in the case, the Court, with the consent of the parties, bifurcated the trial to decide that issue, as well as the identity of the LLC's managers, first. Specifically, the issues to be decided in Stage 1 of the trial ("Stage 1 issues") are:

    a. Is the 2010 Amended and Restated Operating Agreement valid and binding on BLF and its members?

    b. How many managers does BLF have? Is Jim Bennett a manager?

12. The parties submitted proposed findings of fact and conclusions of law on 4 March 2022, and, after the close of the evidence, were permitted to revise those proposals. The Court heard final arguments and took the matter under submission on 31 March 2022.

13. The Stage 1 issues are now ripe for determination.

### III.  FINDINGS OF FACT[5]

14.  The Court incorporates herein and adopts as Findings of Fact the Stipulations filed by the parties on 28 February 2022, (ECF No. 139), and incorporated in the Pretrial Order, (ECF No. 146).

15.  The Court admitted fourteen exhibits and received testimony from seven witnesses who appeared live and by deposition during Stage 1 of the trial.

16.  Bert is highly educated, having received a doctoral degree in counseling psychology from Florida State University.  (Bench Trial Tr. March 28, 2022 [hereinafter "Tr. I."] 44:11–12, ECF No. 156.)  He operates a private practice in which he performs psychological testing.  (Tr. I 51:2–3.)

#### The Avery County Property

17.  Beginning in the 1960s, the Bennett parents purchased land totaling more than three hundred acres, still in its natural state, in the mountains of Avery County, North Carolina.  (Tr. I 166:2–10.)  Bert Bennett, Jr. ("Father Bennett"), an avid outdoorsman, enjoyed fishing on the property.  He invited friends and took his sons along with him, first tent-camping and later staying in a cabin that was built at the intersection of two streams on land that became the "hub" of the property.  (Tr. I 55:15–20, 78:3–9.)

18.  Penn Craver ("Craver") is an accomplished attorney who practiced corporate, tax, wealth management and estate planning law in North Carolina for

---

[5] Any determination later stated as a Conclusion of Law that should have been stated as a finding of fact is incorporated in these Findings of Fact.  Citations to the record herein are not exhaustive and do not necessarily reflect all evidence upon which corresponding findings of fact are based.

over five decades. Early in his career, Craver began providing legal services to Quality Oil Company, LLC ("Quality Oil"), an established client of his law firm. (Tr. I 146:24–47:1.) Father Bennett was an owner and the President of Quality Oil. (Bench Trial Tr. March 29, 2022 [hereinafter "Tr. II"] 228:8–10, ECF No. 157.) In due time, Craver and Father Bennett established a close professional relationship, and Craver became Father Bennett's personal attorney as well. (*See* Tr. I 74:8–18.) Both sides agree that Father Bennett trusted Craver implicitly. (*See, e.g.*, Tr. I 74:19–75:1; Tr. II 234:6–11.)

19. In the 1980s, Father Bennett, after discussing his estate planning with Craver, began a "gifting" program with respect to the land he and his wife, Lillian F. Bennett ("Mother Bennett") owned in Avery County. Thereafter, for several years the Bennett parents conveyed undivided interests in tracts of land surrounding the "hub" to each of their eight children.[6] (Tr. I 166:23–67:19.)

20. At least until 2007, Bert was not aware that he had been gifted and owned a portion of the Avery County property. (Tr. I 77:22–78:2, 81:16–82:13.)

The 2001 Deed to John

21. In 2001, John Bennett ("John"), another of the Bennett siblings, asked his father if he could exchange the tract he had been given for approximately thirty-five acres of land that he had identified near a ridge. Father Bennett agreed to the request and directed Craver to draft the necessary deed. (N.C. General Warranty Deed Dated Nov. 1, 2001, Jt. Ex. 1.)

---

[6] The Bennett siblings, in birth order, are as follows: Bert, Graham, Joy, John, Louise, Terry, Ann, and Jim. Joy died in 2001. (Tr. I 42:18, 55:3.)

22.     Father Bennett had already given the land that John desired to his other children as part of the "gifting program"; thus, their agreement was necessary to complete the transaction. Father Bennett therefore instructed Craver to draft a deed which he presented to his remaining children and told them to sign. (Jt. Ex. 1.)

23.     The family had a "tradition" of signing documents that required all of their signatures at holiday gatherings, typically Thanksgiving or Christmas, when they were all present. (*See, e.g.*, Tr. I 93:4–7; Tr. II 239:3–5, 273:20–74:4.)

24.     In 2001, Bert believed the Avery County property belonged to his father, and he signed the deed at a family gathering without reviewing or questioning it simply because his father asked him to sign it. (Tr. I 80:11–82:15.)

The 2007 Operating Agreement

25.     In 2006, Father Bennett and Craver engaged in discussions regarding the formation of an LLC to hold the Avery County property. Craver advised Father Bennett that such an arrangement would be beneficial to reduce the risk of individual liability, centralize management, and facilitate estate planning. (Tr. I 168:9–69:3; *see* Tr. II 233:24–34:5.)

26.     Acting on this advice, Father Bennett directed that an LLC be formed, that the LLC be manager-managed, and that Graham and Ann be named as its managers. (Tr. I 170:1–14 (Craver testifying that based on Father Bennett's business experience, he "thought that a manager managed would be more effective than trying to get everybody to agree to everything each time"); 171:8–19 (Father Bennett chose

Graham as manager because he "had all the confidence in the world" in him and in Ann "as backup").)

27. Craver drafted BLF's Articles of Organization and its original operating agreement (the "2007 Operating Agreement") to reflect Father Bennett's wishes. (Jt. Ex. 6; Tr. I 171:20–72:13.)

28. The Articles of Organization were filed on 18 January 2007 and specify that BLF is to be "manager-managed." (Jt. Ex. 5.)

29. Schedule I to the 2007 Operating Agreement identifies the original members as follows: Father Bennett and Mother Bennett, each owning a twenty-three percent interest; and siblings Graham, Ann, Jim, Bert, Louise, and Terry,[7] each owning a nine percent interest.[8] (Jt. Ex. 6, at Sch. I.)

30. Section 2.4 of the 2007 Operating Agreement states, "There shall initially be two (2) Managers of the Company" and identifies Graham and Ann as BLF's initial managers by reference to Schedule II, in which both of their names are listed. (Jt. Ex. 6, at § 2.4 & Sch. II.)

31. Bert admits that Graham and Ann are managers of BLF. (Tr. I 95:13–18.)

32. None of the children, including Bert, Graham, Ann or Jim, participated in any discussions with their Father or Craver with respect to the formation of the

---

[7] Terry Bennett, a Bennett sibling and former plaintiff, dismissed her claims against all other parties and is therefore no longer a party in this case. (ECF No. 67.)

[8] Having received his approximately thirty-five acres in 2001, John was not a party to the 2007 Operating Agreement.

LLC or the content of the 2007 Operating Agreement. There was no negotiation. Father Bennett told Craver what he wanted, and Craver documented it. (Tr. I 172:14–24.) According to Craver, "[i]t's more or less a formation that [Father] Bennett desired. . . . So, no, there was no haggling back and forth." (Tr. I 172:21–24.)

33. As was their tradition, the Bennett family members circulated signature pages for the 2007 Operating Agreement at a holiday gathering. It is undisputed that each of the signatures on the 2007 Operating Agreement is authentic.

34. It is further undisputed that neither Bert, nor his siblings Graham, Ann, Jim, or Louise believed it was necessary to request to read the 2007 Operating Agreement prior to signing it. None of them questioned their father about his decision to form the LLC or any of the terms of the agreement. All of them signed the 2007 Operating Agreement intending to be bound—regardless of what it said—because it was what their father wanted, they considered the Avery County property his, and they both trusted and respected his decisions regarding it. (*See, e.g.*, Tr. I 93:16–94:20; Tr. II 274:7–16.)

35. The 2007 Operating Agreement went into effect on 1 February 2007. (*See* Jt. Ex. 6, at Def02104–07.) On 8 February 2007, Craver filed a deed in which each of the members transferred his or her interest in the Avery County property to BLF. (Deed Dated February 1, 2007, Jt. Ex. 4.)

36. The 2007 Operating Agreement states that the purpose of the LLC is "to continue the farming operation of its Members . . . and to engage in any other lawful

purposes[.]" (Jt. Ex. 6, at § 1.8.) To date, the LLC has functioned primarily to hold the family property and has not operated for profit.

37. The 2007 Operating Agreement permits amendment only through a writing approved by the members holding a majority of the membership interest. (Jt. Ex. 6, at § 11.5 ("This Agreement . . . may only be amended or modified by a writing executed and delivered by the Members owning a Majority in Interest."); *see also* Jt. Ex. 6, at § 2.2 ("The following actions may not be taken by the Managers without approval of a Majority in Interest of the Members: (a) the amendment of this Agreement[.]").)

38. The 2007 Operating Agreement permits BLF's members to consent to action without a meeting: "Any action that is to be taken at a meeting of the Members may be taken without a meeting by written consent signed by the number of Members that would be necessary to take the action at a meeting at which all Members entitled to vote were present and voted." (*See* Jt. Ex. 6, at § 5.6(c).) Citing this provision, Craver testified that a meeting was not necessary to elect Jim as a manager and that the 2010 Amendment served as written consent to the action. (Tr. I 191:24–92:19, 197:6–200:18; *see* Jt. Ex. 6, at § 11.5.)

<u>The 2010 Amendment</u>

39. In 2010, while discussing amendments to the operating agreement of another business with Craver, Father Bennett asked whether BLF's operating agreement would benefit from some of the same changes. In particular, Father

Bennett wanted to make transfers between family members easier and, as Craver testified, without "a whole lot of hoopla[.]" (Tr. I 177:11–21).

40.     Craver agreed that BLF would benefit from such a change and suggested that Father Bennett, who had always funded BLF's operations entirely himself, also consider changes to the operating agreement to permit mandatory capital calls by the mangers so that the "second generation owners," his children, would have a fair mechanism to fund BLF themselves. Correspondingly, Craver suggested that the operating agreement allow for redemption in the event a member did not contribute the required capital. (Tr. I 177:11–78:13.)

41.     Father Bennett agreed with Craver and directed him to make the changes discussed. At the same time, Father Bennett, concerned that both Graham and Ann were busy in their professional lives, directed Craver to add Jim as a third manager of BLF. (Tr. I 182:2–8).

42.     In response to Father Bennett's instructions, Craver drafted a document he entitled, "2010 Amended and Restated Operating Agreement of Bennett Linville Farm, LLC" (the "2010 Amendment"). Craver intended for the 2010 Amendment to clearly reflect Father Bennett's changes to: (i) expand the number of managers from two to three, adding Jim as a manager, (ii) provide for mandatory contributions to capital subject to the approval of a majority of the managers, (iii) grant BLF an option to redeem a member's interest under certain conditions; and (iv) change transfer restrictions to (among other things) permit transfers by a member to the member's family for estate and gift tax planning purposes. (Tr. I 177:5–78:21.)

43.     As with the 2007 Operating Agreement, the parties to this action were not involved in drafting the 2010 Amendment, and there were no negotiations regarding its contents.  Father Bennett decided what the terms would be, and Craver documented Father Bennett's decision.  (Tr. I 180:5–9.)

44.     During discovery in this action, two versions of the 2010 Amendment were produced, each bearing identical signature pages with the same footer.[9] (*Compare* Jt. Ex. 9, *with* Jt. Exs. 8, 107.[10])  In all respects, the content of the two versions is the same except that Section 2.4 of one version repeats the language of the 2007 Operating Agreement that there "shall *initially be two (2)* Managers of the Company."  (Jt. Ex. 9, at § 2.4 (emphasis added).)  In Section 2.4 of the other version the language changes to "[t]here shall be three (3) Managers of the Company."  (Jt. Exs. 8 & 107, at § 2.4.)  In addition, in the "three-manager" version, the body of the

---

[9] The footer on the signature pages in both versions of the document is C:\Documents and Settings\graham\Local Settings\Temporary Internet Files\OLK142\00007853.DOC. Although Graham was unsure whether this footer is used by Quality Oil, where he is Chief Executive Officer, Graham testified that it does indeed contain his name.  (Tr. II 260:18–22, 261:16–20.)  In Joint Exhibit 9, the version of the 2010 Amendment in which section 2.4 states that there "shall initially be two (2) Managers[,]" this footer appears consistently throughout the document—although some pages contain "Brenda," the name of Graham and Father Bennett's assistant at Quality Oil.  (Tr. II 262:11–21.)  However, in Trial Exhibit 8, the version of the 2010 Amendment in which section 2.4 states that there "shall be three (3) Managers[,]" this footer appears only on the signature pages.  A different footer, beginning M:\Worldox\0129 appears on each page of the body of the document.  Craver testified that the "Worldox" footer was used by Craver's law firm.  (Tr. I 157:4–11.)

[10] Exhibit 107A, Exhibit 107, and Exhibit 8 are the same document in all material respects. Exhibit 107A is the original from Craver's file and contains the firm's footer ("ECV") as well as Craver's handwritten notations.  Exhibit 107 is an exact duplicate of this original and was produced by Craver in response to Plaintiff's subpoena.  The content of Exhibit 8, which was produced in discovery, is the same as the content of Exhibit 107 and Exhibit 107A but it does not contain Craver's handwritten notations.  The documents are identical in every other respect.

document bears a footer from Craver's office that is different from the footer on the signature pages.

45. Regardless of these differences, both versions provide that "Schedule II shall be amended upon any change of Managers[,]" (Jt. Exs. 8–9, 107, at § 2.4), both define "Manager" as "those individuals set forth in Schedule II hereto[,]" (Jt. Exs. 8–9, 107, at § 12.1(p)), and Schedule II, attached to each version, lists the same three managers: Graham, Ann, and Jim, just as Father Bennett instructed. (Jt. Exs. 8–9, 107, at Sch. II.)

46. It is undisputed that on or about 6 October 2010, Craver's assistant, Marie Davis, forwarded a draft of the 2010 Amendment to Graham to deliver to his father, who did not have an e-mail account. (Jt. Ex. 7; Tr. I 180:18–21, 182:23–83:2.)

47. Although the e-mail transmitting the draft specifically referred to the addition of Jim as a manager and Schedule II of the draft reflected all three managers: Graham, Ann and Jim, Section 2.4 of the draft retained the language from the 2007 operating agreement providing that there "shall *initially be* two (2) Managers of the Company." (Jt. Ex. 9, at § 2.4.)

48. Sometime after the draft was emailed to Graham, Craver decided to change the language of Section 2.4 in the document from "shall initially be two (2) managers" to "shall be three (3) managers" to be consistent with Schedule II. (*See* Jt. Ex. 8.)

49. Because the language of Section 2.4 specifies that the number and identity of the managers is controlled by Schedule II, and because the Schedule II

attached to the October 6 draft identified all three managers including Jim, Craver considered his later fine-tuning of the text in section 2.4 from "shall initially be two (2) managers" to "shall be three (3) managers" to be superfluous. (Tr. I 196:21–25 (Craver testimony: "Section 2.4 has different verbiage meaning the same thing that there are three managers as specified on schedule 2. One says initially there were two managers but the managers set forth on schedule 2 and there were three people stated.").)

50. Both versions of the 2010 Amendment authorize, among other things, managers to make capital calls without member consent ("Members shall make additional Capital Contributions to the Company as determined by a majority of the Managers."). (Jt. Exs. 8–9, 107, at § 7.2.) Additionally, both versions of the 2010 Amendment contain the same language permitting transfers by a member to the member's family for estate and gift tax planning purposes, (Jt. Exs. 8–9, 107, at § 9.2), and granting BLF an option to redeem a member's interest under certain conditions, (Jt. Exs. 8–9, 107, at § 9.6). These substantive changes to the original 2007 Operating Agreement are described in an introductory clause that is identical in both versions: "WHEREAS, the Members desire to provide for mandatory contributions to capital, permit certain transfers to family members, and grant Company an option to redeem a Member's Membership Interest under certain conditions[.]" (Jt. Ex. 8, at Def01216; Jt. Ex. 9, at Def01382; Jt. Ex. 107, at ECV00005.)

51. Craver has no document reflecting a transmittal of the 2010 Amendment after he edited Section 2.4 and he cannot recall when or how the final

version of the 2010 Amendment was sent to the Bennett family for signature. However, he testified that the final version was sent. (Tr. I 195:12–14.)

52. As the attorney for both Quality Oil and Father Bennett personally, Craver testified that he frequently visited and hand-delivered documents to Father Bennett in his office at Quality Oil. (Tr. I 183:15–19.)

53. The greater weight of the evidence establishes that, after October 6, Craver and Father Bennett reviewed the 2010 Amendment that is now Joint Exhibit 107, Father Bennett was satisfied that Craver had drafted the amendment Father Bennett intended, and Joint Exhibit 107 is the final version of that 2010 Amendment.

54. Craver further testified that the signed original copy of the 2010 amendment that he retained in his file, a true copy of which is Joint Exhibit 107, corresponded exactly to what he sent the Bennett family for signature, that he did not make any change to the 2010 Amendment after receiving the signature pages, and that he has retained this fully executed final 2010 Amendment in his file since late 2010.[11] (Tr. I 186:1–9, 195:12–14.)

55. Craver was not present when the members signed the signature pages and has no knowledge regarding when they signed. (Tr. I 175:11–20.) He testified only that he drafted what Father Bennett intended, that he sent it out for signature, and that Father Bennett's intentions never changed throughout the drafting and signing process. The only edit he made was to wordsmith Section 2.4, a change that

---

[11] The original of the 2010 Amendment was not available at the time Craver testified. At Plaintiff's request, Craver provided the original following his testimony, and it, (Jt. Ex. 107A), was admitted into evidence without objection.

was prompted not by any change in Father Bennett's intentions, but merely by Craver's own desire to perfect the document. (Tr. I 159:10–23.)

Signing the 2010 Amendment

56.     The greater weight of the evidence establishes that, consistent with family tradition, signature pages for what the parties understood was an amendment to the BLF operating agreement were circulated during a family gathering at the parents' home in late 2010, prior to the end of the year, and that at least the following individuals were present: Father Bennett, Mother Bennett, Bert, Graham, Ann and Jim.

57.     Bert's signature appears on page 25 of both versions of the 2010 Amendment, immediately below the signature lines for Father Bennett and Mother Bennett. Text above the signatures on page 25 includes the definition of "Membership Interest" and this language:

> "IN WITNESS WHEREOF, the undersigned, being all of the Members of the Company, have caused this Agreement to be duly adopted by the Company effective as of the day and year first above written, and do hereby assume and agree to be bound by and to perform all of the terms and provisions set forth in this Agreement."

(Jt. Exs. 8–9, 107, at p. 25.)

58.     The signatures of the remaining members follow on page 26 of both versions of the 2010 Amendment. (Jt. Exs. 8–9, 107, at p. 26.)

59.     At trial, each member who testified authenticated his or her own signature, including Bert. (Tr. II 224:12–13 (Louise), 245:25–46:2 (Graham), 276:11–14 (Ann), 296:4–7 (Jim); Tr. I 107:5–8, 119:3–6 (Bert).) Based on his familiarity with

their handwriting, Craver authenticated the signatures of Mother Bennett and Father Bennett. (Tr. I 174:7–25.)

60. No signatory who testified can recall whether a complete copy of the 2010 Amendment was present when the signature pages for the document were circulated. However, none of them, including Bert, had a desire to read or even ask questions about the content of the 2010 Amendment before signing it as an indication of their agreement to be bound by it. (*See, e.g.*, Tr. I 102:14–18 (Bert did not read or request a copy before signing).)

61. Like his siblings, Bert, testified that he signed the 2010 Amendment without asking to read it or asking any questions about it because of the trust and respect he had for his father. Bert testified that he would have done whatever his father wanted regarding the family property. (Tr. I 108:1–5 ("A. I did certainly view that if dad wanted something done with [the property], we would be—I would be happy to do it. Q. And that's exactly what you did? A. That's exactly what I did."); (*see also* Tr. II 221:21–22:2 (Louise did not read before signing; signed because dad wanted her to), 257:9–13 (Graham signed because dad wanted him to), 274:5–16 (Ann signed because dad wanted her to), 296:9, 297:5–13, 299:1–3 (Jim does not remember signing; did not ask for copy before signing; trusted Father Bennett's wishes regarding property)).)

62. Bert also testified that Graham told him that his signature was needed for an administrative change that would allow the Bennett parents to transfer their interests in BLF to their children, including Bert. (Tr. I 103:19–20.) Graham testified

that he did not recall any such statement to Bert about the 2010 Amendment but that he would not have told Bert something that was untrue. (Tr. II 265:6–10.) The 2010 Amendment in fact included a change in Section 9.2 making it easier for the Bennett parents to bequeath and gift the property to their children. (Jt. Exs. 8, 9, 107, at § 9.2.)

63. Graham returned the completed signature pages to Craver, who maintained them with the original of the 2010 Amendment in his business files. (Tr. I 153:23–54:1; 194:21–22; 195:12–14.)

### The 2012 Bequest, Gift, and Fishing Lease

64. When Mother Bennett died in March 2012, her membership interest in BLF passed to Graham, the personal representative of her estate, pursuant to her will. In accordance with her will and with Section 9.2 of the 2010 Amendment, Graham transferred Mother Bennett's membership interest *pro rata* to each of the remaining members of BLF, including Bert. (Jt. Ex. 10.) However, Bert did not sign the document assigning Mother Bennett's interest and did not realize that he had received a share of her interest until he learned of it several years later in the course of litigation involving his brother John. (Jt. Ex. 10; Tr. I 70:21–71:2, 109:23–10:4.)

65. In June 2012, Father Bennett gifted his membership interest *pro rata* to each of the remaining members of BLF, including Bert, pursuant to Section 9.2 of the 2010 Amendment. (Jt. Ex. 11.) As with Mother Bennett's transfer, Bert did not sign the document assigning Father Bennett's interest and did not realize that he

had received a share of his father's interest until several years later after the family members were in litigation. (Jt. Ex. 11; Tr. I 70:21–71:2, 112:10–15.)

66.     In June 2012, Bert signed a Consent to Action Without Meeting (the "Consent") documenting his agreement to a fishing lease between BLF and Father Bennett. Father Bennett paid BLF thirty thousand dollars ($30,000.00) a year under the terms of the lease, which Bert testified was used "to cover the day-to-day expenses, the care-taker's expenses and just upkeep of the cabin." (Tr. I 121:14–15.) The Consent specifies that it is executed pursuant to the 2010 Amendment. Bert authenticated his signature on the Consent, which was on the line directly below the signature line for Jim. Jim's signature line identifies him as both a manager and member of BLF. (Jt. Ex. 12; Tr. I 114:25–15:2.)

## IV.     CONCLUSIONS OF LAW[12]

67.     Based on the foregoing Findings of Fact, the Court makes the following Conclusions of Law.

68.     The Court has jurisdiction over the parties and the subject matter of this action.

69.     This case was properly designated as a mandatory complex business case and assigned to the undersigned. The parties stipulated to a bench trial and consented to bifurcating the trial such that Stage 1 issues would be decided first. The Court has heard the evidence with respect to the Stage 1 issues and has authority to make Findings of Fact and Conclusions of Law with respect to those issues.

---

[12] Any Findings of Fact that are more appropriately deemed Conclusions of Law are incorporated by reference into the Court's Conclusions of Law.

70.     There is a legitimate controversy with respect to the validity of the 2010 Amendment, making declaratory relief appropriate.  The Court's declaration is necessary to determine which version of BLF's Operating Agreement controls.  *See Augur v. Augur*, 356 N.C. 582, 588 (2002) ("[A] declaratory judgment should issue (1) when [it] will serve a useful purpose in clarifying and settling the legal relations at issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding." (citation and internal quotation marks omitted)).

71.     At the outset, there is disagreement between the parties as to which party bears the burden of proof with respect to Stage 1 issues.  The Court concludes that with respect to their claims sounding in contract, each party bears the burden of proof with respect to the declaration(s) that party claims the Court should make, regardless of whether that declaration occurs in Stage 1 or Stage 2.  One who asserts a fact and seeks declaratory judgment declaring that fact has the burden of proving that fact.  *See e.g., Bizrobe Trust v. InoLife Techs., Inc.*, 2018 NCBC LEXIS 160, at *16 (N.C. Super. Ct. Nov. 30, 2018) (denying plaintiff's affirmative motion for summary judgment on declaratory judgment claim where plaintiff failed to satisfy its burden of proof); *JCG & Assocs., LLC  v. Disaster Am. USA, LLC*, 2021 NCBC LEXIS 109, at *7 (N.C. Super. Ct. Dec. 9, 2021) (considering together declaratory judgment claims and counterclaims when the evidence was "closely tied together").

72.     However, unlike most claims that fall neatly into one party's camp or the other, the Court concludes that identifying the operating agreement in effect,

whether it is Plaintiff's 2007 version or Defendants' 2010 version, is an overarching declaration that impacts claims made by both sides. Bert's claim for a declaratory judgment that the 2010 Amendment is invalid (and thus that the 2007 Operating Agreement controls) stands in direct opposition to Defendants' declaratory judgment claim that the 2010 Amendment is valid (and thus that the 2007 Operating Agreement is inoperative). Consequently, in this case both sides bear the burden of convincing the Court by a preponderance of the evidence that their version of the operating agreement controls.

73. "The essence of any contract is the mutual assent of [all] parties to the terms of the agreement so as to establish a meeting of the minds." *Snyder v. Freedman*, 300 N.C. 204, 218 (1980) (citation omitted); *see Mach. Co. v. Chalkley*, 143 N.C. 181, 183 (1906) ("The first and most essential element of an agreement is the consent of the parties[.]"). "Whether mutual assent is established and whether a contract was intended between parties are questions for the trier of fact." *Creech v. Melnik*, 347 N.C. 520, 527 (1998) (citing *Snyder*, 300 N.C. at 217).

74. In addition, "[w]hen a party affixes his signature to a contract, he is manifesting his assent to the contract." *Mosely v. WAM, Inc.*, 167 N.C. App. 594, 599 (2004).

75. The Court concludes that the 2010 Amendment that was admitted into evidence as Joint Exhibit 107 (the original as Joint Exhibit 107A) is the controlling operating agreement for BLF for the reasons that follow.

76.     First, the greater weight of the evidence proves that BLF's members holding a majority of the membership interests, including Bert, knew they were assenting to an amendment to the BLF Operating Agreement when they each put their names on signature pages in 2010.

77.     The greater weight of the evidence further proves that BLF's members holding a majority of the membership interests, including Bert, knew that the signature page they each signed would be attached to the final version of the amendment to the operating agreement containing the terms that Father Bennett had specified to BLF's attorney, Penn Craver.

78.     Bert testified that he neither asked to read the 2010 Amendment nor asked his father or the managers any questions regarding the 2010 Amendment prior to signing the page signifying his assent to it.  Bert signed because, when it came to the Avery County property, "[i]f dad wanted something done with it . . . I would be happy to do it."  (Tr. I 108:2–3.)

79.     The greater weight of the evidence establishes that Joint Exhibit 107 accurately reflects the terms Father Bennett wanted to be included in the 2010 Amendment and that Father Bennett's intention with respect to those terms did not change from the time he articulated them to Craver until the signature pages were attached to Joint Exhibit 107.

80.     Therefore, the Court concludes, that the evidence, by its greater weight, establishes that the members holding a majority of the membership interests in BLF, including Bert, assented to the 2010 Amendment that is Joint Exhibit 107.

81. Bert cites several cases to support his position that the fact that the signatures were on pages separated from the body of the agreement when they were signed, coupled with the change Craver made to Section 2.4 of the 2010 Amendment, requires the conclusion that there was no meeting of the minds with respect to the 2010 Amendment. The Court disagrees. The greater weight of the evidence establishes that the parties' overarching and indisputable intention was to agree to the terms their father wanted. The signature pages each of them signed were attached —as they intended—to a document drafted by Craver to achieve what their father wanted.

82. In *GECMC 2006-C1 Carrington Oaks, LLC v. Weiss*, 2017 N.C. App. LEXIS 532 (N.C. Ct. App. 2017) (unpublished), the signatory signed "between thirty and forty signature pages" each time he visited a law firm so that they could be used for various real estate transactions. The signatory was unaware that one of those signature pages would be "eventually attached" to a guaranty agreement and, therefore, the Court of Appeals held that his signature did not indicate an assent to be bound to the guaranty agreement. *Id.* at *3. In contrast, the parties here signed one set of signature pages and were aware that they would be attached to the amended operating agreement their father wanted, once it was finished, and each of them accepted their father's terms unquestionably without the need even to read them.

83. The cases cited by Bert from courts in Illinois and New York are similarly distinguishable. In *Midwest Mfg. Holding, L.L.C. v. Donnelly Corp.*, 1998

U.S. Dist. LEXIS 1398 (N.D. Ill. 1998), the parties entered into several letters of intent. For convenience purposes the defendant signed an unaffixed signature page before negotiations were finalized. Negotiations then failed. The court, recognizing that the executed signature page was "merely . . . a convenience[,]" noted that the parties had "additional, outstanding, material issues still . . . open and need[ing] to be resolved" on the date the signatory signed, precluding an intent to be bound by the final document. 1998 U.S. Dist. LEXIS 1398, at *11–12. Similarly, in *Chariot Grp., Inc. v. American Acquisition Partners, L.P.*, 751 F. Supp. 1144 (S.D.N.Y 1990), the defendant signed a signature page for "convenience only" while negotiations were still ongoing between the parties. 751 F. Supp. at 1151.

84. Conversely, here, Father Bennett's intentions were fixed at the time the parties signed the signature pages, and his intentions did not change. There was no negotiation over the terms of the amendment. His children, including Bert, simply agreed to sign a document that reflected their father's intentions. Consequently, nothing about the act of attaching their signature pages to the correct, final document reflecting those intentions defeated the formation of the contract.

85. Moreover, none of the parties, including Bert, testified that the change Craver made to Section 2.4—regardless of whether it was made before or after the signature pages were completed—was a deciding factor in his or her decision to assent to the 2010 Amendment. The only material factor was their father's wishes, and there was no evidence to suggest that Craver's edit did anything other than ensure that he had captured Father Bennett's wish that Jim be made a manager of BLF.

86. It also bears mentioning that the law is well-settled in North Carolina that "[t]he duty to read an instrument or to have it read before signing it, is a positive one, and the failure to do so, in the absence of any mistake, fraud or oppression, is a circumstance against which no relief may be had, either at law or in equity." *Harris v. Bingham*, 246 N.C. 77, 78–79 (1957); *see Town of Belhaven v. Pantego Creek, LLC,* 250 N.C. App. 459, 470 (2016) ("In North Carolina, parties to a contract have an affirmative duty to read and understand a written contract before they sign it."); *Westmoreland v. High Point Healthcare Inc.*, 218 N.C. App. 76, 83 (2012) ("It has long been the law in North Carolina that the law will not relieve one who can read and write from liability upon a written contract, upon the ground that he did not understand the purport of the writing, or that he has made an improvident contract, when he could inform himself and has not done so." (citation and internal quotation marks omitted)); *Ussery v. Branch Banking & Trust Co.*, 368 N.C. 325, 336 (2015) ("One who executes a written instrument is ordinarily charged with knowledge of its contents, and he may not base his action on ignorance of the legal effect of its provisions in the absence of considerations such as fraud or mistake[.]" (citing *Mills v. Lynch*, 259 N.C. 359, 362 (1963) and *Pierce v. Bierman*, 202 N.C. 275, 279 (1932)).

87. Even if the Court were to conclude that Graham presented the amendment to Bert as a change to allow the Bennett parents to transfer their interests, the Court concludes that Bert was not relieved of his duty to read the

amendment before signing it.[13] He admits that nothing prevented him from inquiring further as to the changes being made or from obtaining a copy of the proposed amendment and reading it before signing. (Tr. I 103:2–18); *Ussery*, 368 N.C. at 338 (reliance on verbal assurances contrary to contract's contents was unreasonable because the signatory was "misled through his own want of reasonable care and circumspection" (citation and internal quotation marks omitted)). Had he requested a copy and read it prior to signing, under either version of the 2010 Amendment, he would have seen that Jim was to become a manager.

88. Second, the final edit Craver made to Section 2.4 of the 2010 Amendment did not change the meaning of the provision. Under either reading of the 2010 Amendment, (*compare* Jt. Ex. 9, *with* Jt. Exs. 8, 107), the outcome would be the same: Jim was added as a manager of BLF.

89. The plain language of Section 2.4 establishes that Schedule II controls the number and identity of the managers. The operative language of the section is: "The name of the initial Managers are set forth on Schedule II attached hereto and made a part hereof, which Schedule II shall be amended upon any change of Managers." (Jt. Ex. 6, at § 2.4.)

90. The number and identity of BLF's managers on Schedule II is consistent in the two versions of the amendment before the Court. (*Compare* Jt. Ex. 9, at Sch. II, *with* Jt. Exs. 8 & 107, at Sch. II.) Only the text describing the managers changed

---

[13] Notably, Bert has not alleged a claim for fraud. He alleges only that Graham provided him the signature pages and represented that he needed Bert's signature for "administrative purposes." (Third Am. Comp. ¶ 31.)

from one version to the other, and it is a distinction without a difference. Joint Exhibit 9 retains the language from the 2007 Operating Agreement that there "shall initially be two (2) Managers of the Company." There were, indeed, "initially" two managers. But the controlling Schedule II in the 2010 Amendment correctly listed Father Bennett's intended three managers, Graham, Ann and Jim. Therefore, Craver's subsequent decision to delete the word "initially" in recognition of the fact that he was drafting an amendment, and to change "two managers" to "three managers" to make the text consistent with the controlling schedule, was not necessary to accomplish Father Bennett's intention that Jim become the third manager of the LLC and was of no consequence to the validity of the 2010 Amendment.

91.    The terms in the version of the 2010 Amendment that was admitted as Joint Exhibit 107 were the terms intended by Father Bennett, and Father Bennett's intentions with respect to those terms did not change at any point throughout the drafting and execution of the 2010 Amendment.

92.    Schedule II of each of the competing versions of the 2010 Amendment lists three managers: Graham, Ann and Jim. The Court therefore concludes that Jim became a manager of BLF as of 1 October 2010, the effective date of the 2010 Amendment.

93.    Third, even if Bert did not understand or agree to the terms of the 2010 Amendment that his father wanted, he was in the minority. As noted above, amending the 2007 Operating Agreement required a vote of the members holding a

majority of the membership interests. (Jt. Ex. 6, at § 11.5.) At trial, members Graham, Ann, Jim, and Louise each testified that he or she signed the signature pages for the 2010 Amendment with the intent to be bound to the 2010 Amendment that was admitted as Joint Exhibit 107 and that establishes Jim as a manager of BLF. Craver testified, unopposed, that Father Bennett's intent was likewise as stated in Joint Exhibit 107. At that time, these members alone collectively held fifty-nine percent of the membership interests of BLF, constituting a majority. (Jt. Ex. 6, at Sch. I.)

94. Moreover, by statute, "[a]ny person bound by the operating agreement is bound by any amendment adopted, as provided in the operating agreement." N.C.G.S. § 57D-2-31(e). Thus, Bert, who was bound to the 2007 Operating Agreement, is similarly bound to the 2010 Amendment that was approved by the majority. For this reason alone, the 2010 Amendment (Joint Exhibit 107) is valid and controlling with respect to all members, including Bert.

95. As to whether BLF's members were required to sign a "Consent to Action Without Meeting" to effectuate their decision for Jim to be a manager, the Court concludes that the 2010 Amendment itself constitutes effective written consent in accordance with Section 5.6(c) of the 2010 Amendment, and no additional writing was necessary. (*See e.g.*, Ord. Mot. Prelim. Inj. ¶ 13, ECF No. 87 ("[Bert argues] that this written consent must exist separate and apart from any writing required to memorialize the amendment. The Court disagrees. By its terms, nothing in the

original operating agreement prevents the members from consenting to action and memorializing an amendment in the same writing.").)

96. Finally, Bert is quasi-estopped from denying the 2010 Amendment's validity. Quasi-estoppel, also known as "estoppel by benefit," "is directly grounded . . . upon a party's acquiescence or acceptance of payment or benefits by virtue of which that party is thereafter prevented from maintaining a position inconsistent with those acts." *Godley v. Cnty. of Pitt*, 306 N.C. 357, 361 (1982) (citation omitted); *see Kyle v. Felfel*, 254 N.C. App. 684, 693 (2017) (stating that quasi-estoppel "is designed to prevent a party from benefitting by taking two clearly inconsistent positions." (citation and internal quotation marks omitted)). The doctrine "rests upon principles of equity and is designed to aid the law in the administration of justice when without its intervention injustice would result." *Brooks v. Hackney*, 329 N.C. 166, 173 (1991) (internal citation and quotation marks omitted).

97. "Under a quasi-estoppel theory, a party who accepts a transaction or instrument and then accepts benefits under it may be estopped to take a later position inconsistent with the prior acceptance of that same transaction or instrument." *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 18 (2004) (citation and quotation marks omitted); *see Cap. Outdoor Adver., Inc. v. Harper,* 7 N.C. App. 501, 505 (1970) ("[I]t is settled law in North Carolina that a party will not be allowed to accept benefits which arise from certain terms of a contract and at the same time deny the effect of other terms of the same agreement." (citing *Shuford v. Oil Co.*, 243 N.C. 636 (1956)).

98.     Thus, a defendant seeking to bar a plaintiff's claim through the application of the doctrine of quasi-estoppel must show that the plaintiff (1) with knowledge of the facts (2) now takes a position inconsistent with his or her former position (3) to the disadvantage of another. *See generally* Eugene R. Anderson, *Preventing Inconsistencies in Litigation with a Spotlight on Insurance Coverage Litigation: The Doctrines of Judicial Estoppel, Equitable Estoppel, Quasi-Estoppel, Collateral Estoppel, "MEND the Hold," "FRAUD on the Court" and Judicial and Evidentiary Admissions*, 4 Conn. Ins. L.J. 589, 661 (1997).  Defendants' success in making this showing is necessarily fact dependent.  *See, e.g.*, *Whitacre P'ship*, 358 N.C. at 18; 28 Am. Jur. 2d *Estoppel and Waiver* § 173 ("[W]hether the facts presented adequately establish estoppel is for the jury or other trier of fact to decide.").

99.     Bert's signature on the June 2012 "Consent to Action Without Meeting" that authorized a fishing lease between BLF and Father Bennett states explicitly on its face that it is an action taken pursuant to the 2010 Amendment.  (Jt. Ex. 12.) Bert's signature on the Consent establishes his knowledge of and intent to be bound by its terms.  The evidence establishes that Bert benefitted from his father's financial contribution to the upkeep of the property by way of the fishing lease.  Having relied on the 2010 Amendment for this benefit, the Court concludes that the doctrine of quasi-estoppel prevents Bert from now denying the 2010 Amendment's validity.[14]

---

[14] However, the Court does not conclude, as Defendants contend, that Bert is quasi-estopped from denying the 2010 Amendment's validity based on the Bennett parents' transfers, even though both transfers also expressly reference the 2010 Amendment. (Jt. Exs. 10–11.) Bert's signature was not on either the estate assignment or the gift assignment, and there is no evidence that he read or otherwise had knowledge of either document.  Equity does not prevent Bert from denying the 2010 Amendment's validity because he benefitted from it

CONCLUSION

100. Based on the foregoing Findings of Fact and Conclusions of Law, it is HEREBY ORDERED, ADJUDGED, and DECREED as follows:

i. The Court hereby ENTERS JUDGMENT declaring that the 2010 Amended and Restated Operating Agreement that was admitted as Trial Exhibit 107 is BLF's controlling operating agreement and has been in full force and effect since 1 October 2010.

ii. The Court hereby ENTERS JUDGMENT declaring that, since 1 October 2010 and at all times thereafter, and pursuant to BLF's controlling operating agreement, there have been three managers of BLF: Graham F. Bennett, Ann Bennett-Phillips and James H. Bennett.

iii. Having resolved the Stage 1 issues, the Court will hear evidence with respect to the remaining issues in the case. The parties are directed to appear on 6 April 2022 at 9:30 A.M. to proceed accordingly.

IT IS SO ORDERED, this the 4th day of April, 2022.

/s/ Julianna Theall Earp
Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases

---

while completely unaware of the facts. *See Steubner Realty 19, Ltd. v. Cravens Rd. 88, Ltd.*, 817 S.W.2d 160, 164 (Tex. Ct. App. 1991) ("[E]stoppel precludes a party, *with knowledge of the facts*, from taking a position inconsistent with his or her former position to the disadvantage or injury of another[.]" (emphasis added)).